Notice: This opinion is subject to formal revision before publication in the
Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify
the Clerk of any formal errors in order that corrections may be made
before the bound volumes go to press.

# United States Court of Appeals

## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued September 16, 2003     Decided November 7, 2003

No. 01-1503

CONSOLIDATED EDISON COMPANY OF NEW YORK, INC.,
PETITIONER

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

NRG POWER MARKETING, INC., ET AL.,
INTERVENORS

Consolidated with
02-1004, 02-1010, 02-1187

On Petitions for Review of Orders of the
Federal Energy Regulatory Commission

*William F. Young* and *Elias G. Farrah* argued the cause
for petitioners and intervenors in support of petitioners.

Bills of costs must be filed within 14 days after entry of judgment.
The court looks with disfavor upon motions to file bills of costs out
of time.

With them on the briefs were *Neil H. Butterklee*, *Elizabeth Ward Whittle*, and *J. Cathy Fogel*. *Arnold H. Quint* entered an appearance.

*Larry D. Gasteiger*, Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. With him on the brief were *Cynthia A. Marlette*, General Counsel, and *Dennis Lane*, Solicitor.

*Howard E. Shapiro* argued the cause for intervenors. With him on the brief were *Kenneth M. Simon, Woody N. Peterson, David P. Yaffe, Jonathan D. Simon*, and *Steven A. Weiler.*

Before: SENTELLE, ROGERS, and TATEL, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* TATEL.

TATEL, *Circuit Judge*: In these consolidated cases, we consider what remedies, particularly monetary ones with retroactive effect, are available for electric service providers and ultimately electricity consumers who experience substantial price increases when a deregulated energy market fails to operate properly. Here, the Federal Energy Regulatory Commission—though finding serious problems in the market for operating reserves, imposing a prospective rate cap, and requiring other corrective actions—held that it lacked authority under the Federal Power Act to revise rates retroactively. Although we agree with that holding, we find that FERC (1) failed to explain adequately why certain emergency procedures for rebilling were unavailable, (2) erred in concluding that the independent operator had not violated its tariff for pricing different types of reserves, and (3) failed to consider other alleged tariff violations. We therefore grant the petitions in part and remand for further proceedings consistent with this opinion.

## I.

The New York Independent Service Operator (NYISO), a non-profit corporation, operates the bulk power transmission

system in New York. NYISO provides open access transmission service and maintains system reliability. *Cent. Hudson Gas & Elec. Corp.*, 83 F.E.R.C. ¶ 61,352, 62,406 (1998), *order on reh'g*, 87 F.E.R.C. ¶ 61,135 (1999). It also administers competitive, bid-based electricity markets and monitors them for exercises of market power. *N.Y. Indep. Sys. Operator, Inc.*, 89 F.E.R.C. ¶ 61,196 (1999) (Market Monitoring Plan or MMP Order). NYISO operates under tariffs filed with FERC, including the tariff involved in this case, the Market Administration and Control Area Services Tariff (Services Tariff). Unlike tariffs for traditional cost-of-service rates, the filed tariffs at issue here contain no precise prices; instead, they set standards for NYISO's administration of competitive electric power markets.

Under the Services Tariff, NYISO maintains a market for ancillary services, including operating reserves. *See* Services Tariff, J.A. at 594–751. Operating reserves allow utilities to produce electricity on short notice to meet load (the total demand for service on a utility system). Ten-minute spinning reserve (SR) is synchronized to the system and available almost immediately. Ten-minute non-spinning reserve (NSR), though not loaded, can be synchronized within ten minutes. Certain amounts of ten-minute operating reserves must be available every hour to maintain system reliability. Power suppliers offer "bids" to sell SR and NSR at certain prices in the NYISO market. Load-serving entities (LSEs)—transmission facility owners that provide electric load—then purchase reserves from NYISO.

NYISO also operates under its Market Monitoring Plan (MMP) and Temporary Extraordinary Procedures (TEP), two measures filed with and approved by FERC that give NYISO authority to remedy specified problems that may arise in the deregulated market. While the precise scope of these measures is in some dispute, they allow NYISO to take certain actions, such as issuing letters under the MMP to request that a participant cease behavior that suggests the exercise of market power and recalculating the prices under TEP to the level that would have cleared the market absent a software malfunction.

The Federal Energy Regulatory Commission oversees this market-based system pursuant to the Federal Power Act (FPA), 16 U.S.C. § 791a *et seq.*, several provisions of which are at issue in this case. Under sections 205 and 206, FERC has both the authority and duty to regulate rates for wholesale electric power and to prohibit utilities from charging unreasonable rates. *Id.* §§ 824d, 824e (2000). Section 205(d) requires public utilities to file new rates or proposed changes with FERC, which typically take effect in sixty days. *Id.* § 824d(d). For "good cause shown," however, FERC may waive the sixty-day notice requirement, thus allowing rate changes to take effect immediately. *Id.* Under section 206(a), FERC may investigate whether a particular rate or charge is "just and reasonable." *Id.* § 824e(a). If FERC finds a rate unreasonable, it must order imposition of a just and reasonable rate. *Id.* FERC may then order refunds for any period subsequent to the "refund effective date," a date FERC establishes that must be at least sixty days after the filing of the complaint. *Id.* § 824e(b). Under section 206, however, FERC may not order refunds for any period prior to the filing of the complaint. *Id.* In contrast, FPA section 309 gives FERC authority to order refunds if it finds violations of the filed tariff. *See id.* § 825h (vesting FERC with authority to "perform any and all acts … it may find necessary or appropriate to carry out the provisions of [the Act]"); *Towns of Concord, Norwood, & Wellesley, Mass. v. FERC*, 955 F.2d 67, 73 (D.C. Cir. 1992) (explaining that authority to give refunds derives from FPA section 309).

This case arises out of events that occurred approximately two months after NYISO began operations. Between January 29, 2000, and late March the LSEs experienced a dramatic increase in prices in the bid-based market for NSR. Prices spiked from averages of $1.04 per megawatt per hour in November 1999 and $1.06 the following month to an average of $65.57 in February 2000, reaching a high of $302 that month. At the same time, the quantity of NSR that suppliers offered dropped dramatically. For example, NSR offered at less than $30 declined approximately seventy-five percent, from over 1200 megawatts prior to January 29 to a low of just

over 300 megawatts during that period. According to NYI-SO, during the six weeks from January 29 to March 10, the total cost to LSEs purchasing ten-minute reserves rose by approximately $65 million. During that same period, NYISO reported that the market for NSR was also highly concentrated—just three generators controlled ninety-seven percent of NSR capacity. *See N.Y. Indep. Sys. Operator, Inc.*, 91 F.E.R.C. ¶ 61,218, 61,794 (2000) (Initial Order).

On March 27, 2000, NYISO responded to this substantial price increase by filing a request with FERC pursuant to FPA section 205 to suspend immediately market-based bids for ten-minute reserves. It also asked for authority to (1) revise its Services Tariff to subject NSR bids to a $2.52 cap, the highest market clearing price for NSR prior to January 29, the last day on which the market appeared to function normally, and (2) rebill for March "pending the outcome of [an alternative dispute resolution (ADR)] process" that NYISO requested FERC to initiate. Request of NYISO for Suspension of Market-Based Pricing for 10-Minute Reserves and To Shorten Notice Period, J.A. at 54. Around the same time, the LSEs filed complaints with FERC pursuant to FPA section 206. According to the LSEs, NYISO violated its Services Tariff and operated under several market design flaws—such as failing to accept bids from other qualified suppliers—that compounded the problems in the reserves market. The LSEs asked FERC to direct NYISO to correct the practices that allegedly violated the Tariff and to order refunds for the alleged overcharges resulting from the violations. They also sought to compel NYISO to invoke its Temporary Extraordinary Procedures, a set of remedial measures that FERC had previously approved. *See N.Y. Indep. Sys. Operator, Inc.*, 88 F.E.R.C. ¶ 61,228 (1999) (First TEP Order), *reh'g denied*, 89 F.E.R.C. ¶ 61,168 (1999).

In the first of three orders, FERC found that NYISO had "presented sufficient evidence to call into question continued reliance on market-based pricing for non-spinning reserves." Initial Order, 91 F.E.R.C. at 61,798. It found that the markets were "even more concentrated than indicated in the

original analysis," and that the "conditions under which market-based rate authority for ancillary services was granted do not match the current operational realities of the New York ISO's reserve markets." *Id.* at 61,799. That said, FERC stated that it "ma[d]e no finding here that any supplier engaged in the withholding of capacity." *Id.*

Based on its conclusion that the market was not operating properly, FERC granted NYISO's request for a $2.52 bid cap and waived the sixty-day notice requirement so that the cap could take effect the day after the filing. *Id.* at 61,793. Explaining that it had no authority to grant retroactive relief, however, FERC rejected NYISO's requests to rebill for reserves in March and to initiate ADR procedures. *Id.* FERC affirmed this decision in two subsequent orders. *See* 97 F.E.R.C. ¶ 61,155 (2001) (First Rehearing Order); 99 F.E.R.C. ¶ 61,125 (2002) (Second Rehearing Order). With respect to the LSE complaints alleging NYISO tariff violations and market design flaws, FERC denied the request for refunds because it found that NYISO had not violated the Services Tariff. Initial Order, 91 F.E.R.C. at 61,806–07. It also declined to require NYISO to implement its Temporary Extraordinary Procedures. *See id.* at 61,804. Granting prospective relief, however, FERC directed NYISO to make several changes in its administration of the reserves market. *Id.* at 61,800. The Commission affirmed this decision in its First Rehearing Order. *See* 97 F.E.R.C. at 61,677–82.

Both NYISO and the LSEs now seek review of these three orders. The suppliers intervene in support of FERC. Before us are three issues: whether FERC properly (1) concluded that it lacked authority to provide retroactive relief under FPA section 205, (2) found the Temporary Extraordinary Procedures inapplicable and unavailable to provide relief, and (3) determined that NYISO had not violated the Services Tariff. We address each issue in turn.

## II.

We begin with the question of retroactive relief under FPA section 205. Section 205(d) provides:

> Unless the Commission otherwise orders, no change shall be made by any public utility in any . . . rate, charge, . . . or . . . rule . . ., except after sixty days' notice to the Commission and to the public. Such notice shall be given by filing with the Commission and keeping open for public inspection new schedules stating plainly the change or changes to be made in the schedule or schedules then in force and the time when the change or changes will go into effect. The Commission, for good cause shown, may allow changes to take effect without requiring the sixty days' notice herein provided for by an order specifying the changes so to be made and the time when they shall take effect and the manner in which they shall be filed and published.

16 U.S.C. § 824d(d). Although FERC found good cause to waive the sixty-day notice period, thus allowing the bid cap to become effective the day after NYISO's filing, it concluded that it had no authority to grant retroactive relief for the two months prior to the filing despite the dramatic price spike. Both NYISO and the LSEs insist that FERC may order such retroactive relief upon a finding of good cause. We disagree.

In *Columbia Gas Transmission Corp. v. FERC*, 895 F.2d 791 (D.C. Cir. 1990), we interpreted a provision in the Natural Gas Act that is virtually identical to FPA section 205, holding that FERC's good cause waiver authority does not permit it to make a retroactive rate adjustment. *Id.* at 795–97. Courts have applied interpretations of Natural Gas Act provisions to their counterparts in the Federal Power Act because "the relevant provisions of the two statutes are in all material respects substantially identical." *City of Girard, Kan. v. FERC*, 790 F.2d 919, 920 n.4 (D.C. Cir. 1986) (quoting *Arkansas Louisiana Gas Co. v. Hall*, 453 U.S. 571, 577 n.7 (1981) (quoting *Fed. Power Comm'n v. Sierra Pacific Power Co.*, 350 U.S. 348, 353 (1956))) (internal quotation marks omitted). As FERC explains, moreover, its decision to deny NYISO retroactive relief rested on *Columbia Gas*'s rationale—the filed rate doctrine and its corollary, the rule against retroactive ratemaking. The filed rate doctrine "forbids a regulated

entity to charge rates for its services other than those properly filed with the appropriate federal regulatory authority." *Ark. La. Gas Co.*, 453 U.S. at 577. The related rule against retroactive ratemaking "prohibits the Commission from adjusting current rates to make up for a utility's over- or under-collection in prior periods." *Towns of Concord*, 955 F.2d at 71 n.2. By authorizing only prospective rate changes, these doctrines ensure rate predictability, *see Columbia Gas*, 895 F.2d at 793, and by preventing discriminatory pricing, they promote equity, *see Exxon Co., U.S.A. v. FERC*, 182 F.3d 30, 49 (D.C. Cir. 1999).

Courts have recognized only two circumstances in which a rate adjustment may take effect prior to a section 205 filing: when parties have notice that a rate is tentative and may be later adjusted with retroactive effect, or when they have agreed to make a rate effective retroactively. *See id.* at 49 (noting that "[t]he rule against retroactive ratemaking ... does not extend to cases in which [customers] are on adequate notice that resolution of some specific issue may cause a later adjustment to the rate being collected at the time of service" (alteration and omission in original) (internal quotation marks and citations omitted)); *City of Holyoke Gas & Elec. Dep't v. FERC*, 954 F.2d 740, 744 (D.C. Cir. 1992) (finding FERC's decision to make the rate change effective prior to the filing date proper because the parties had contracted to make rate retroactive and a waiver was not against the public interest). Neither of these circumstances undermines the twin goals of predictability and equity. *See Exxon*, 182 F.3d at 49 (finding that "equity and predictability are not undermined when the Commission warns all parties involved that a change in rates is only tentative and might be disallowed" (quoting *OXY USA, Inc. v. FERC*, 64 F.3d 679, 699 (D.C. Cir. 1995) (internal quotation marks omitted)); *Columbia Gas*, 895 F.2d at 796 (describing *City of Piqua v. FERC*, 610 F.2d 950, 954–55 (D.C. Cir. 1979), in which the parties agreed to make a rate change effective on a date before the filing, as a case that did not implicate the filed rate doctrine).

NYISO argues that this case falls under the notice exception. It points to its Market Monitoring Plan and Temporary

Extraordinary Procedures as sources of notice to suppliers that rates might be adjusted retroactively. Although the MMP authorizes NYISO to undertake remedial measures to correct problems associated with the exercise of market power, NYISO points to nothing in the MMP suggesting that such measures may have retroactive effect. *See* MMP Order, 89 F.E.R.C. at 61,601–02. We thus see no way that the MMP could have provided the requisite notice to market participants.

NYISO's reliance on TEP as a source of notice also fails, but for a different reason. TEP allows NYISO to recalculate prices to the level they would have reached absent market design or implementation flaws that produced non-competitive prices. First TEP Order, 88 F.E.R.C. at 61,754. According to NYISO, this demonstrates that suppliers had notice that rates could be adjusted retroactively even without a showing of market power. NYISO, however, failed to raise this argument before the Commission, either in the initial proceedings or in its rehearing request, so we may not consider it now. *See* 16 U.S.C. § 825l(b) ("No objection to the order of the Commission shall be considered by the court unless such objection shall have been urged before the Commission in the application for rehearing unless there is reasonable ground for failure so to do.").

NYISO offers a second, more intriguing argument for avoiding the filed rate doctrine and the rule against retroactive ratemaking. Pointing out that sellers and buyers in a deregulated market rely not on a single published rate, but rather on a filed tariff that provides for a competitive bid process, NYISO argues that participants expect to transact business pursuant to market-based prices; rebilling for past non-market prices would therefore be neither inequitable nor unpredictable. This argument is twice waived: NYISO never presented it to FERC, and although NYISO hints at the argument in its opening brief here, *see* Petitioners' Br. at 54, it failed to develop it fully until its reply brief, *see* Petitioners' Reply Br. at 15–16; *see also A.J. McNulty & Co. v. Sec'y of Labor*, 283 F.3d 328, 338 (D.C. Cir. 2002) ("[B]ecause this

point appears for the first time in the company's reply brief, we will not consider it.").

### III.

We next turn to the LSEs' argument that because of the design and implementation flaws associated with NYISO's administration of the electricity market, FERC should have directed NYISO to provide a remedy under its Temporary Extraordinary Procedures. TEP is designed to address unanticipated market design flaws and transitional abnormalities. A "market design flaw" is defined as "a market structure, market design, or implementation flaw which would result in market outcomes that would not be produced in a workably competitive market." First TEP Order, 88 F.E.R.C. at 61,752–53. "Transitional abnormalities" refer to "systemic equipment malfunctions, including telecommunications failures or . . . equipment outages." *Id.* at 61,753.

The LSEs argue that FERC should have used TEP to remedy two market flaws: NYISO's exclusion of a qualified supplier, the Blenheim-Gilboa facility, from bidding into the NYISO reserves market, and NYISO's failure to accept lower-priced bids from western suppliers. These flaws, the LSEs charge, resulted in non-market-based prices. According to the LSEs, using the "extraordinary corrective actions" under TEP would have allowed NYISO, after following required procedures, to rebill the LSEs at the newly calculated rates that would have cleared the market had no flaws existed. This would have granted the LSEs—and presumably their customers—some monetary relief from the $65 million spike.

Although FERC acknowledged that TEP allows for retroactive recalculation, it insisted that TEP applies only in circumstances of straightforward calculation errors. First Rehearing Order, 97 F.E.R.C. at 61,682. "The NYISO's TEP authority," FERC concluded, "was not designed to be used in circumstances such as these." *Id.* FERC went on to explain that *NRG Power Marketing, Inc. v. NYISO*, 91 F.E.R.C. ¶ 61,346 (2000), in which it approved NYISO's use of TEP,

was "clearly distinguishable, since it involved limited, simple, and precise corrections to ensure that prices conformed to the filed rate." First Rehearing Order, 97 F.E.R.C. at 61,682.

FERC's explanation suffers from two related defects. First, FERC imposed no such limitation when it initially approved this part of TEP. *See* First TEP Order, 88 F.E.R.C. at 61,754. Indeed, FERC used the same broad language contained in TEP itself: "We will accept the ISO's proposal to recalculate prices to the level [they] would have [ ] reached in the absence of a market design flaw or transitional abnormality." *Id.* Finding this approach reasonable, FERC explained that "the recalculated prices are intended to reflect the prices that would have resulted from the market design [ ] already approved." *Id.* To be sure, when FERC extended TEP beyond its initial ninety days it used slightly different language, appearing to limit the procedures to correct "technical implementation errors and operational anomalies." *See N.Y. Indep. Sys. Operator, Inc.*, 90 F.E.R.C. ¶ 61,320, 62,066 (2000) (Second TEP Order). But FERC neither defined what it meant by "technical implementation errors" nor explained whether or how such errors differ from "market design flaws"—the language in TEP itself and in the First TEP Order. Hence we do not think that FERC's past orders can justify its narrow view of TEP in this case.

Second, we see nothing in *NRG Power* to suggest that FERC's decision there actually turned on whether the price recalculation was simple, straightforward, or precise. Although FERC described the case as involving "erroneous calculation" and "computational error," *NRG Power*, 91 F.E.R.C. at 62,166, the problem seems to have been more complex. Indeed, *NRG Power* bears some resemblance to the situation here. There, the error arose from software problems and NYISO's disregard of low-cost bids, resulting in posted prices that exceeded what properly established market-clearing prices would have been. Here, FERC squarely found that certain aspects of NYISO's "design and operating protocols," including its failure to accept bids from the Blenheim-Gilboa facility and from western suppliers, exacerbated market concentration and the opportunity for the exercise of

market power. Initial Order, 91 F.E.R.C. at 61,799–800. FERC also pointed out that the analysis submitted in support of market-based rates contemplated that the supply market would include these suppliers. *Id.* at 61,799 n.13, 61,800. For its part, NYISO conceded both that it had failed to model reserve bids from Blenheim-Gilboa into its software, and that software limitations and the nature of NYISO's market design prevented it from accepting bids from western suppliers. NYISO Answer, J.A. at 214, 218. Given the similarities between this case and *NRG Power*, we cannot accept FERC's claim that these two flaws fall outside the scope of a TEP-based remedy.

Moreover, even if *NRG Power* had involved only an erroneous calculation, it still would not preclude the application of TEP to problems beyond technical miscalculation. Although in *NRG Power*, NYISO took remedial action under TEP, FERC stated that "[u]nder these circumstances involving the erroneous miscalculation of a formula rate, the NYISO did not have to rely on any temporary authority or interim procedures to correct incorrect energy clearing prices." 91 F.E.R.C. at 62,166. If, as FERC found, TEP is not needed for miscalculation errors, then we do not understand how its scope can be limited to such errors.

In sum, given that FERC points to only one case as precedent for limiting the scope of TEP to technical miscalculations—a case that itself expressed no such limitation—and given the broad language of TEP and the orders approving it, we find FERC's summary conclusion that TEP is inapplicable to the circumstances of this case fails its obligation of reasoned decisionmaking. *See Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 52 (1983). Accordingly, we will remand for FERC to explain why TEP does not apply here.

## IV.

We turn finally to the LSEs' argument that NYISO violated its own Tariff. FERC's interpretation of tariffs receive *Chevron*-like deference. *See Idaho Power Co. v. FERC*, 312

F.3d 454, 461 (D.C. Cir. 2002). If the tariff language is unambiguous, we need not defer to FERC's interpretation; if the language is ambiguous, we defer to FERC's construction so long as it is reasonable. *Id.* While the Commission has discretion to determine the remedy for tariff violations—which may include refunds, *see* 16 U.S.C. § 825h; *Towns of Concord*, 955 F.2d at 73—it has a "general policy of granting full refunds" for overcharges, *id.* at 76. In addition, when deciding whether to order refunds, FERC must provide a reasoned explanation for its decision: it must show that it has "considered relevant factors and . . . struck a reasonable accommodation among them," and that its order was "equitable in the circumstances. . . ." *Id.* (first omission in original).

The LSEs argue that FERC erred in failing to find that NYISO had violated four requirements of its Tariff.

### *Pricing of Spinning and Non-spinning Reserves*

The LSEs claim that NYISO violated its Services Tariff by setting the price of ten-minute SR no lower than the price of ten-minute NSR. According to the LSEs, this practice magnified the effect of the NSR price spike—as NSR prices went up, NYISO's practice drove SR prices up as well. Finding the Tariff's language ambiguous, FERC explained that NYISO's pricing of NSR was "reasonable" because it was needed to clear the market. First Rehearing Order, 97 F.E.R.C. at 61,679. According to FERC, NYISO feared that if higher bids were accepted for NSR, suppliers with SR capacity might decline to bid into the SR market and offer NSR instead. *See id.* Had this occurred, NYISO might have been unable to ensure that SR represented fifty percent of available reserves, as the Tariff requires. *See* Services Tariff, J.A. at 729.

FERC's explanation might well be reasonable, but we agree with the LSEs that NYISO violated the Tariff's plain language. Rate Schedule 4 of the Services Tariff sets forth the rule for pricing SR: "The Day-Ahead Availability price for Spinning Reserve for each hour *shall be* equal to the highest Day-Ahead Availability Bid made by a Supplier that

has been scheduled Day-Ahead to provide Spinning Reserve in that hour." *Id.* at 736 (emphasis added). The Rate Schedule repeats the same instruction for pricing Day-Ahead Availability NSR, *id.* at 739, and gives similar instructions for the Real-Time Availability prices for SR and NSR, *id.* at 736, 740. Moreover, Section 4.21 of the Tariff states that payments for each megawatt "shall be *determined separately* for each of the three categories of Operating Reserves: spinning reserve, 10-minute non-[spinning] reserve and 30-minute reserve." *Id.* at 674 (emphasis added).

We see nothing ambiguous about this language. It requires NYISO to price SR and NSR separately. If NYISO believed it needed to modify its practice to ensure adequate supplies of SR, it should have sought permission from FERC.

In its brief, FERC insists that even if it had found a tariff violation, it would have exercised its discretion to deny refunds. Perhaps so, but this argument comes from agency counsel, not FERC. Because FERC never determined that NYISO violated the Tariff, the Commission had no opportunity to exercise its refund discretion. Accordingly, we will remand to FERC for it either to follow its "general policy" of providing refunds, or to explain, in accordance with *Towns of Concord*, 955 F.2d at 76, its divergence from this policy.

### *Blenheim-Gilboa Facility*

The LSEs argue that NYISO also violated its Services Tariff by excluding the Blenheim-Gilboa facility from the NSR market. Before considering the merits of this claim, however, we must address FERC's argument that the LSEs waived this issue because they characterized their complaint against NYISO not as a tariff violation, but as a market design flaw.

Although it is true that in their initial complaint, the LSEs did not describe their claim as one of tariff violation, they clearly did so in their rehearing request. *See* Application for Rehearing of LSE Intervenors, J.A. at 319, 335–36. FERC expressly acknowledged the argument, stating that "LSE

Intervenors argue that the NYISO's practices were contrary to the Services Tariff" because "NYISO improperly excluded the Blenheim-Gilboa pumped storage facility from competing to supply 10-minute reserves." First Rehearing Order, 97 F.E.R.C. at 61,681. But instead of addressing the argument, FERC simply explained that its prospective remedy was "best suited" to remedy the problem. *See id.* It now claims here—erroneously, as we discuss below—that it found a tariff violation. Under these circumstances, FERC cannot reasonably argue that it lacked notice of the tariff violation claim. *See Villages of Chatham & Riverton, Ill. v. FERC*, 662 F.2d 23, 30 (D.C. Cir. 1981) ("[A]ny argument brought clearly to the attention of the Commission by the party's petition for rehearing has been preserved for review in a court of appeals.").

As to the merits of the Blenheim-Gilboa issue, Rate Schedule 4 of NYISO's Tariff incorporates New York State Reliability Rules, *see* Services Tariff, J.A. at 729, which in turn allow NSR to "be composed of [units generated by] pumped storage hydro" facilities, *id.* at 310 n.2. The LSEs assert that because Blenheim-Gilboa is a pumped storage hydro plant that satisfies NYISO's criteria for supplying operating reserves, NYISO had no basis under its Tariff for excluding the facility.

FERC agreed with the LSEs that NYISO should have included Blenheim-Gilboa and that doing so would have significantly reduced market concentration. Initial Order, 91 F.E.R.C. at 61,800. Concluding that this error required correction "as quickly as possible," FERC directed NYISO to model Blenheim-Gilboa into its software and to accept the facility's reserve bids. *Id.* As to the LSEs' claim that the exclusion of Blenheim-Gilboa amounted to a tariff violation requiring a refund, however, FERC had only this to say:

> [T]he question here is what is the fairest and most efficient way to ensure that the participants in the New York market receive the benefits of a well functioning competitive market. The Commission believes that the procedures it has chosen and the

> determinations it has made are best suited to accomplish these ends within the bounds of the Federal Power Act.

First Rehearing Order, 97 F.E.R.C. at 61,681.

We think this response entirely inadequate. Not only does it fail to address the LSEs' claim that NYISO violated its Tariff, skipping instead straight to the question of remedy, but FERC never explains why it chose a prospective remedy. Given FERC's findings that the market analysis underlying approval of market-based rates anticipated the inclusion of Blenheim-Gilboa, that NYISO had no reason to exclude the facility, and that accepting bids from Blenheim-Gilboa would have dramatically lowered market concentration, we will remand to FERC to explain why NYISO did not violate the Services Tariff. If the Commission finds a tariff violation but decides against ordering a refund, then, again, it has an obligation to explain why it is departing from its "general policy of granting full refunds." *Towns of Concord*, 955 F.2d at 76.

### *Western Suppliers*

The LSEs' third tariff violation claim arises from NYISO's refusal to accept bids of cheaper reserves from western suppliers of operating reserves. Again, FERC argues that the LSEs characterized this claim as one of market design flaw rather than tariff violation. This time FERC is correct. The LSEs neither presented the argument in their complaint nor adequately raised it in their rehearing request. The LSEs did assert that failure to include western suppliers violated the Services Tariff, but they failed to point to the relevant portion of the Tariff. They identify a specific Tariff provision in their brief here, but this comes too late. Parties claiming a violation of a published tariff must point to the specific provision involved and give FERC an opportunity to address the issue. Otherwise, we lack jurisdiction to hear the claim. *See* 16 U.S.C. § 825l(b).

*Self-Supply*

Last, the LSEs contend that NYISO violated its Tariff when it refused to allow them to "self-supply" operating reserves without first bidding into the NYISO market. Although FERC ordered NYISO to give the LSEs the option of self-supply without the bidding requirement, it concluded that denying them this opportunity in the past had not violated the Tariff. *See* Initial Order, 91 F.E.R.C. at 61,806; First Rehearing Order, 97 F.E.R.C. at 61,677.

Schedule 4 of the Services Tariff, Section 6.0, provides: "Transactions may be entered into to provide for Self-Supply of Operating Reserves. Customers seeking to Self-Supply Operating Reserves must place the Generator(s) supplying any one of the Operating Reserves under ISO control. The Generator(s) must meet ISO rules for acceptability." Services Tariff, J.A. at 745. Contrary to the LSEs' assertion, this language is hardly "clear and unconditional." Petitioners' Br. at 48. Although the language requires NYISO to permit self-supply, it can be read in one of two ways: either that generators must bid into the ISO market, or that they may sell directly to the utility as long as they meet ISO rules for acceptability. Given this ambiguity, we must defer to FERC's interpretation so long as it is reasonable. Since the LSEs provide no basis for concluding that FERC's interpretation is unreasonable, we will deny the petition for review with respect to this claim.

## V.

We have considered petitioners' remaining arguments and found them to be without merit. The petitions for review are denied in part and granted in part, and this case is remanded to FERC for further proceedings consistent with this opinion.

*So ordered.*