Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

―――

Argued November 16, 2007  Decided December 18, 2007

No. 06-1025

CONSOLIDATED EDISON COMPANY
OF NEW YORK, INC., ET AL.,
PETITIONERS

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

KEYSPAN-RAVENSWOOD, LLC, ET AL.,
INTERVENORS

―――

Consolidated with
No. 06-1027

―――

On Petitions for Review of Orders of the
Federal Energy Regulatory Commission

―――

*Elias G. Farrah* and *William F. Young* argued the cause for petitioners. With them on the briefs were *Rebecca J. Michael*, *Neil H. Butterklee*, and *James J. Dixon*.

*Jeffery S. Dennis*, Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. With him on the brief were *John S. Moot*, General Counsel, and *Robert H. Solomon*, Solicitor.

*Kenneth M. Simon* argued the cause for intervenors KeySpan-Ravenswood, LLC, Long Island Power Authority, and NRG Power Marketing, Inc. With him on the brief were *Mark L. Perlis*, *David P. Yaffe*, *Howard E. Shapiro*, *Steven A. Weiler*, *Robert C. Fallon*, and *Christopher C. O'Hara. James J. Bertrand* entered an appearance.

Before: ROGERS and GARLAND, *Circuit Judges,* and SILBERMAN, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* ROGERS.

ROGERS, *Circuit Judge*: In these consolidated cases, the Petitioners challenge two orders of the Federal Energy Regulatory Commission ("FERC") following our decision in *Consolidated Edison Co. of New York v. FERC*, 347 F.3d 964 (D.C. Cir. 2003). In *Con Edison*, the court remanded two issues to FERC for further explanation in connection with the remedies available for electric service providers that experienced substantial price increases in January-March 2000 as a result of failures in a deregulated energy market. *Id*. at 966-67; 972-73. In the challenged orders, FERC explained its reasoning for not invoking temporary emergency procedures ("TEP") of the New York Independent System Operator, Inc. ("NYISO") that allowed rebilling, and for not ordering refunds despite the NYISO's violation of its tariff when pricing different types of

power reserves. *N.Y. Indep. Sys. Operator, Inc.*, 110 F.E.R.C. ¶ 61,244, 62,005-11 (2005) ("*Remand Order*"); *N.Y. Indep. Sys. Operator, Inc.*, 113 F.E.R.C. ¶ 61,155, 61,609-16 (2005) ("*Rehearing Order*"). In view of the deference due to FERC's determinations that the NYISO had acted reasonably in not implementing TEP because problems in the reserves market did not rise to the level of a market design flaw, and that retroactive refunds were not an appropriate remedy for NYISO's tariff violation because its pricing system protected system reliability, we conclude that FERC's denial of a remedy was not arbitrary and capricious or contrary to law, and we deny the petitions.

**I.**

The issues before the court arise out of events occurring approximately two months after the NYISO began operations. *Con Edison*, 347 F.3d at 966-68. Between January and March 2000, transmission facility owners — i.e., load-serving entities ("LSEs") — experienced dramatic price increases for non-spinning reserve ("NSR") in markets administered by the NYISO. NSR is a power reserve that can be synchronized within ten minutes and is of lower quality than spinning reserve ("SR"), which is available almost immediately. In response to these price increases, NYISO presented a number of requests to FERC, including immediately suspending market-based bids and authorizing a cap for NSR bids. The LSEs complained to FERC that the NYISO had violated its tariff and "operated under several market design flaws" by failing to accept bids from other qualified suppliers, and sought correction of these practices and refunds; they also sought to compel the NYISO to invoke TEP's remedial measures. FERC found no withholding of capacity by any supplier, but inasmuch as the market was not operating properly, approved the NSR bid cap while concluding that it lacked authority to grant retroactive relief, that the NYISO had not violated its tariff, and that it would not require the NYISO

to implement TEP. Upon the LSEs' petitions for review, this court agreed that FERC lacked authority to revise rates retroactively under the Federal Power Act ("FPA"), § 205(d), 16 U.S.C. § 824d(d), but held that FERC had not adequately explained why TEP was unavailable and had incorrectly concluded that the NYISO had not violated its tariff by linking the prices of SR and NSR reserves. The court remanded to FERC, requiring additional explanation concerning why the NYISO's TEP tariff mechanism should not be implemented, and whether refunds should be provided for the NYISO's violations of its tariff when pricing operating reserves. *Id*. at 972-73.

## A.

The TEP process was established, and approved by FERC, in order to "address market design flaws, transitional abnormalities and severe operational difficulties . . . ." *N.Y. Indep. Sys. Operator, Inc.*, 88 F.E.R.C. ¶ 61,228, 61,752 (1999) ("*TEP Order*"). In instances where the NYISO declares that a market design flaw or transitional abnormality is occurring, extraordinary corrective actions can be taken on an interim basis, such as recalculation "of clearing prices to the level that would have been reached if a market design flaw or transitional abnormality had not arisen . . . ." *Id*. at 61,752-755. A possible indicator of a "market design flaw" is excluding a lower-cost resource for no "valid reason." *Remand Order*, 110 F.E.R.C. at 62,006. TEP requires, where possible, prior notice of any such actions by the NYISO. *TEP Order*, 88 F.E.R.C. at 61,753.

On remand, in response to the court's holding in *Con Edison* that FERC's view of TEP's scope was excessively narrow, 347 F.3d at 971, FERC offered that TEP was inapplicable to address the price increases of early 2000 in the NYISO market because "the NYISO did not abuse its discretion by refraining from exercising its TEP authority to recalculate prices," *Remand Order*, 110 F.E.R.C. at 62,005; in any event,

FERC concluded that refunds could not be recalculated with "reasonable certainty" as TEP required. *Id.* at 62,007. Specifically, FERC explained that "TEP provides [the] NYISO with discretion as to when, or whether, it may take [extraordinary corrective actions]," *id*. at 62,005, as well as "what measures to take," *id*. at 62,006; "abuse of discretion" turns on what was "reasonable under the circumstances faced by [the] NYISO at the time," *Rehearing Order*, 113 F.E.R.C. at 61,612. FERC concluded "that [the] NYISO made a reasonable determination that problems in its market were primarily due to [the concentration of] market power [and related bidding behavior], not market design flaws, and that invocation of TEP was not the best and most efficient procedure to remedy such flaws." *Remand Order*, 110 F.E.R.C. at 62,006. Under TEP, FERC noted, "'possible indications of Market Design Flaws include the dispatch of higher priced resources . . . when . . . lower-priced bids are available and not selected . . . *and there is no valid reason for not operating the lower-priced resource*.'" *Id*. (citing TEP, NYISO Services Tariff, Attachment E, at Section A). Here, three entities controlled ninety-seven percent of the NSR market in New York. *Id*. n.62. Although certain lower priced resources were available, namely the "western generators" and the Blenheim-Gilboa facility ("B-G"), FERC explained that there were valid reasons for these sources' exclusion from bidding into reserves. The NYISO had noted that western generators faced serious transmission constraints eighty percent of the time, making them unreliable reserves for eastern areas of the system, while the owners of B-G, the only other source of potential reserves, wished to use its output for energy rather than reserves. *Id*. at 62,006-07; *Rehearing Order*, 113 F.E.R.C. at 61,612-13. According to FERC, the NYISO's market is not designed to provide it with "unconstrained authority" to compel sources like B-G to sell reserves if the owners choose not to do so. *Rehearing Order*, 113 F.E.R.C. at 61,613. Further, FERC noted, the NYISO did not attribute the

reserve market's problems to the western generators' and B-G's non-participation. *Id*. at 61,612.

FERC further emphasized that under TEP, even if market design flaws had been found, tariffs could be recalculated only "'[i]f [it is] possible [to do so] with reasonable certainty.'" *Remand Order*, 110 F.E.R.C. at 62,007 n.65 (quoting NYISO's Services Tariff, Attachment E, § C.2.c.). This would not be possible, in FERC's view, given that the NYISO had only recently commenced operations and historical price information was thus limited. FERC possessed no evidence regarding the effect that inclusion of the western generators could have had on NSR prices. *Id*. at 62,007. Although the NYISO had attempted to create proxy prices through modeling the effect of including B-G in the reserve market, FERC found that the proxy prices' use of future rather than contemporary prices did not yield sufficient certainty. "[B-G had] not bid in the NSR market at the time, and there is no evidence as to what its bid would have been or what factors would have influenced its bid." *Id*. In addition "numerous other parties [had] raise[d] significant objections to the [NYISO methodology] . . . ." *Id*.

**B.**

The court held in *Con Edison* that the NYISO's setting of SR prices to be no lower than NSR prices violated its tariff and that on remand FERC should either "follow its 'general policy' of providing refunds, or [] explain . . . its divergence from this policy." 347 F.3d at 973 (citations omitted). On remand, FERC determined, upon balancing the equities, considering what was just and reasonable, and exploring whether an alternate remedy was more appropriate, that it would not order refunds. *Remand Order*, 110 F.E.R.C. at 62,008. FERC explained that the "NYISO's [pricing] policy did not provide an improper windfall for SR providers because it was the proper and appropriate pricing method that provided efficient prices for the least cost

dispatch." *Id.* In particular, FERC found that the NYISO's pricing method served consumers' "short-run [and] long-run" interests and protected the reliability of the system, *id*. at 62,009, assuring the availability of higher quality SR, which the NYISO's tariff required to represent fifty percent of available reserves, *id*. at 62,002; *Con Edison*, 347 F.3d at 973, by preventing SR reserves' diversion into NSR markets when the latter were expected to be higher priced. *Remand Order*, 110 F.E.R.C. at 62,009. FERC also found that the NYISO's pricing approach "provides, in the long run, the lowest costs to customers and the correct market incentives to generators to bid into the appropriate reserve market." *Id*. Because the NYISO's pricing mechanism provided the lowest possible prices consistent with avoiding the "perverse incentive[]" of diverting SR into NSR, FERC concluded that the resulting profits for SR providers did not constitute "unjust enrichment for which refunds are appropriate." *Id*. at 62,010.

In addition to analyzing bidding incentives and consumers' interests, FERC concluded that refunds would be unjust to the SR producers, who had bid competitively and complied with the tariff rules. The "NYISO . . . should not be able to adopt a pricing regime when necessary to preserve system reliability, and then, after reliability is preserved, require the generators that provided that reliability to pay refunds based on an alternative pricing regime that would not have preserved system reliability." *Rehearing Order*, 113 F.E.R.C. at 61,616. Further, it would be unjust to force SR producers to return their gains while the NSR producers who had allegedly been involved in any market manipulation that did occur retained their profits. *Id*. FERC also noted that customers had at least some notice that a "cost pricing methodology" would be employed. Although the NYISO's approach violated its tariff by not pricing SR and NSR independently, it complied with the tariff provision in "section 4.9 requiring least cost dispatch," *Remand Order*, 110 F.E.R.C.

at 62,010, which was consistent with *Central Hudson Gas & Electric Corp.*, 86 F.E.R.C. ¶ 61,062, 61,227 (1999), where FERC had indicated that the tariff should allow additional purchases of higher quality reserves when this resulted in lowest cost, *Remand Order*, 110 F.E.R.C. at 62,009.

## II.

Petitioners seek an order from the court directing FERC to "abide by its general policy of providing refunds for overcharges, when faced with tariff violations and market design flaws that create[] or exacerbate[] supplier market power." Petrs. Br. at 3. Noting an increase of $71,000,000 in the total cost of NSR and SR from January 29 through March 27, 2000, Petitioners maintain that FERC's original orders found that the NYISO operating reserves market was "plagued with market design flaws, including software flaws, and that the market did not match the circumstances under which original market-based rate authority for operating reserves was granted." *Id*. at 4. They further note that FERC ordered prospective corrections to the market, allowing incorporation of reserves from B-G "as quickly as possible," *N.Y. Indep. Sys. Operator, Inc.*, 91 F.E.R.C. ¶ 61,218, 61,800 ("*Waiver Order*"), and that FERC instituted a prospective bid cap on NSR rates, *id*. at 61,802.

## A.

As an initial matter, Petitioners appear to contend that where market conditions are disrupted, FERC has an "obligation" to grant remedial relief, and thus TEP should be implemented and refunds ordered for SR charges. Petrs. Br. at 12-13; Reply Br. at 7. For support they rely on *California ex rel. Lockyer v. FERC*, 383 F.3d 1006 (9th Cir. 2004), where the Ninth Circuit observed that FERC had "abdicat[ed] its regulatory responsibility" when California consumers were subject to "a variety of [artificial] market machinations," and

"improperly concluded that retroactive refunds were not legally available." *Id*. at 1015, 1018. Inasmuch as the tariff violations and market conditions in the NYISO operating reserves market "are far more egregious than in the *Lockyer* case," Petrs. Br. at 12, Petitioners maintain that FERC's refusal to order TEP implementation or refunds for SR charges cannot be squared with the predicates for its approval of the market-based rate tariff or the severity of the harm to customers who paid rates "far above any 'just and reasonable' standard," *id*. However, *Lockyer* acknowledges that "FERC may elect not to exercise its remedial discretion by requiring refunds," 383 F.3d at 1016, and contrary to Petitioners' assertion, its holding was not to order FERC to grant refunds but was limited to the conclusion that under the circumstances FERC "unquestionably ha[d] the power [to order refunds]," *id*. FERC's authority to order refunds is not at issue in the instant case and, consequently, *Lockyer* is unhelpful to Petitioners, particularly because the Ninth Circuit, like this court in *Con Edison*, remanded for FERC to consider its remedial options. *Lockyer*, 383 F.3d at 1018.

More broadly, Petitioners incorrectly imply that this court should enforce some absolute requirement of action on the part of FERC. "[FERC] ordinarily has remedial discretion, even in the face of an undoubted statutory violation, unless the statute itself mandates a particular remedy." *Conn. Valley Elec. Co. v. FERC*, 208 F.3d 1037, 1044 (D.C. Cir. 2000). Under the FPA, the court has authority "to affirm, modify, or set aside" a FERC order. § 313(b), 16 U.S.C. § 825l(b). However, where FERC possesses but is not required to use certain powers, *see, e.g.*, *Rehearing Order*, 113 F.E.R.C. at 61,611, our review is limited to ensuring that in explaining its decisions, FERC "examine[s] the relevant data and articulat[es] a . . . rational connection between the facts found and the choice made." *Midwest ISO Transmission Owners v. FERC*, 373 F.3d 1361, 1368 (D.C. Cir. 2004) (citations omitted). Our review is particularly deferential

when a challenge "relates to the fashioning of remedies" where "[a]gency discretion is often at its zenith . . . ." *Towns of Concord, Norwood, & Wellesley Mass. v. FERC*, 955 F.2d 67, 76 (D.C. Cir. 1992) (citations omitted).

**B.**

Petitioners' specific contention that FERC abused its discretion in not ordering rebilling under TEP fails for both procedural and substantive reasons. Petitioners dispute FERC's framing of the NYISO's initial decision not to invoke TEP. They also maintain that FERC's refusal to invoke TEP conflicted with policies enunciated in prior FERC orders. Thus, according to Petitioners, FERC did not "enforce the TEP provisions consistent with their intended purpose," Petrs. Br. at 23, and "FERC's failure to enforce the TEP provisions is directly at odds with its own findings." *Id*. at 24. Relatedly, Petitioners contend that the court in *Con Edison* held that "the failure to include [B-G] as a facility to provide operating reserves" was a market design flaw. *Id*. at 26. They suggest, then, that the exclusion of B-G meets FERC's definition of a market design flaw, maintain that any software flaw excluding B-G was equivalent to a market design flaw, and conclude that B-G's exclusion from the market created an "independent obligation" for FERC to invoke the TEP mechanism, *id*. at 27. Based on their assertion that a market design flaw was present, Petitioners conclude that FERC was obligated to invoke TEP to order refunds whether or not the NYISO chose to do so, and that these refunds can be calculated with reasonable certainty, noting that a just and reasonable rate encompasses a range of options and that FERC did not explain why the prospective bid cap it had established in March 2000 was not a suitable rate.

Petitioners' challenges to FERC's framing of the NYISO's initial decision not to invoke TEP are not appropriately developed in their brief and thus not properly before the court.

Their suggestion that the NYISO did not recognize that TEP could be applied is limited to a single sentence in their opening brief.  Petrs. Br. at 23.  "It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones."  *Schneider v. Kissinger*, 412 F.3d 190, 200 n.1 (D.C. Cir. 2005).  Moreover, Petitioners' contention that the NYISO did not make an initial decision against deploying TEP, contrary to FERC's finding, *see, e.g.*, *Remand Order*, 110 F.E.R.C. at 62,006, is raised only in their Reply Brief, *compare* Petrs. Br. at 23 *with* Reply Br. at 8-10, and is thus waived.  "We require petitioners and appellants to raise all of their arguments in the opening brief . . . ."  *Corson & Gruman Co. v. NLRB*, 899 F.2d 47, 50 n.4 (D.C. Cir. 1990).

As regards Petitioners' contention that FERC acted inconsistently with its precedent in not invoking TEP, it is true that FERC had previously noted the availability of TEP and its potential utility in addressing market problems.  *See*, *e.g*., *TEP Order*, 88 FERC at 61,754.  However, acknowledging the existence and utility of a remedial tool is not equivalent to requiring its use in a specific circumstance.  On remand FERC explained that under its tariff, the NYISO has discretion to choose whether or not to invoke TEP.  *Remand Order*, 110 F.E.R.C. at 62,005-06.  Although, as Petitioners note, FERC had acknowledged market failures in early 2000, *see, e.g.*, *Waiver Order*, 91 F.E.R.C. at 61,798, Petitioners are not able to show why this acknowledgment requires FERC to invoke TEP.  Additionally, the fact that FERC approved prospective filings by the NYISO to change aspects of the reserves market in response to the market irregularities of early 2000 does not mean that it is also required to order retroactive relief through TEP.  Concluding otherwise would, as the NYISO has previously noted, open the gates to retroactive changes in tariffs any time the power markets' rules were adjusted.  *See Remand Order*,

110 F.E.R.C. at 62,006 (quoting Motion of the NYISO to Reopen Record, June 25, 2004 at 12); *Conn. Valley Elec. Co.*, 208 F.3d at 1044.

Petitioners fail to show that FERC's explanation concerning B-G is arbitrary and capricious. First, Petitioners mischaracterize *Con Edison*'s holding regarding B-G's exclusion from the reserves market. The court rejected FERC's narrow interpretation of TEP's scope, but it did not hold that B-G's exclusion was a "market design flaw," as Petitioners inaccurately claim. *Compare* Petrs. Br. at 26, *with Con Edison*, 347 F.3d at 971-72. To the extent Petitioners suggest that the exclusion of B-G from the reserve market was similar to the "possible indication[] of Market Design Flaws" discussed in FERC's orders – "the dispatch of higher priced resources . . . when . . . lower-priced bids are available and not selected . . . and there is no valid reason for not operating the lower-priced resource," *Remand Order*, 110 F.E.R.C. at 62,006 (emphasis omitted); *see also* Petrs. Br. at 25-26 – FERC explained that software controlling the reserves market was deliberately modeled to exclude B-G because its owners did not wish to participate in the reserve market, *Remand Order*, 110 F.E.R.C. at 62,007; *Rehearing Order*, 113 F.E.R.C. at 61,613. Although Petitioners dismiss this choice as "irrelevant," Petrs. Br. at 26, B-G owners' preferences are a rational reason for not modeling reserve market software to purchase this potentially lower-priced resource. Petitioners' reference in their Reply Brief to another indicator of market design flaws, Petrs. Reply Br. at 12-13, is not properly before the court, *Corson & Gruman Co.*, 899 F.2d at 50 n.4, and therefore we do not address it.

Second, although FERC's ultimate decision that B-G should be added to the reserve pool used phrases such as "software flaws" and "other market flaws" to describe the state of affairs in early 2000, *N.Y. Indep. Sys. Operator, Inc.*, 97 F.E.R.C. ¶

61,155, 61,680-81, this does not indicate that the initial exclusion of B-G from the software controlling reserve market bids was invalid and rose to the level of a market design flaw. Similarly, the NYISO's assertion in 2000 that it "does not disagree that [B-G's exclusion from the reserves market] could be characterized as a market design flaw," Answer of New York Independent System Operator, Inc. at 6, to Complaint, Motion to Consolidate and Request for Fast Track Complaint Procedures of Rochester Gas and Electric Corporation, Docket No. EL00-04-000, *et al.* (Apr. 20, 2000), lacks both the authority and conclusiveness necessary to render FERC's explanation regarding B-G arbitrary or capricious. The exclusion of B-G from the reserves market may have been unwise in retrospect, but FERC's explanation for why it was not a market design flaw is due deference.

Because FERC on remand provided reasoned explanations, that were consistent with its precedent and the early 2000 market conditions, for not invoking TEP and for why the exclusion of B-G was not a market design flaw, we need not reach the question of whether TEP refunds could be calculated with "reasonable certainty."

## C.

Petitioners' challenge to FERC's decision on remand not to order refunds for high SR prices also fails. Petitioners contend that FERC did not consider all necessary factors and incorrectly balanced the need to provide both fair prices and consistent service by allowing SR producers to receive a "windfall," Petrs. Br. at 20, as a result of uncompetitive market conditions, *id.* at 17-18, and thus acted in a way that conflicted with the FPA's "core purpose of protecting customers from excessive rates," *id.* at 14. Rejecting FERC's determination that penalizing SR producers for alleged wrongdoing by NSR producers would be unfair, they maintain that it is unreasonable to protect

"enormous windfall" profits, *id*. at 20, enjoyed by SR producers given the harm to consumers from paying higher prices.

On remand, FERC considered the relevant factors, balancing the several interests at stake, including the tariff violation, market context, high NSR prices paid, expectations of affected entities, various tariff provisions, and the need to balance fair prices and system reliability, before concluding that refunds were not appropriate. *See Remand Order*, 110 F.E.R.C. at 62,008-010; *Rehearing Order*, 113 F.E.R.C. at 61,616. Further, FERC's decision not to order refunds for the NYISO's tariff violation was not inconsistent with the FPA's "core purpose" for, as Petitioners acknowledge, *see* Petrs. Br. at 14 n.33, the FPA has multiple purposes in addition to preventing "excessive rates," including protecting against "inadequate service," *Cities of Anaheim, Riverside, Banning, Colton & Azusa, Cal. v. FERC*, 723 F.2d 656, 663 (9th Cir. 1984), and promoting the "orderly development of plentiful supplies of electricity," *Pub. Utils. Comm'n of Cal. v. FERC*, 367 F.3d 925, 929 (D.C. Cir. 2004) (citations omitted). FERC reasonably explained that the NYISO's linking of the SR and NSR pricing was most advantageous to consumers precisely because that linking protected the availability of higher quality SR reserves and thus system reliability. *Remand Order*, 110 F.E.R.C. at 62,009-010; *Rehearing Order*, 113 F.E.R.C. at 61,616. Because FERC's explanation of the need to protect the availability of high quality SR reserves provides a reasoned basis for its decision not to order refunds, *see Towns of Concord*, 955 F.2d at 76, we need not address Petitioners' other contentions regarding refunds.

Accordingly, we deny the petitions.