Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

### FOR THE DISTRICT OF COLUMBIA CIRCUIT

————

Argued February 19, 2004         Decided March 16, 2004

No. 02-1276

PSEG ENERGY RESOURCES & TRADE LLC,
PETITIONER

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

NEW YORK INDEPENDENT SYSTEM OPERATOR, INC., ET AL.,
INTERVENORS

————

On Petition for Review of Orders of the
Federal Energy Regulatory Commission

————

*Kenneth R. Carretta* argued the cause for petitioner. With him on the briefs was *Jason A. Lewis.*

*Robert H. Solomon*, Deputy Solicitor, Federal Energy Regulatory Commission, argued the cause for respondent. With

———

Bills of costs must be filed within 14 days after entry of judgment. The court looks with disfavor upon motions to file bills of costs out of time.

him on the brief were *Cynthia A. Marlette*, General Counsel, and *Dennis Lane*, Solicitor.

*William F. Young* argued the cause for intervenor New York Independent System Operator. With him on the brief were *Neil H. Butterklee* and *Elizabeth A. Grisaro*.

Before: SENTELLE, ROGERS, and TATEL, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* TATEL.

TATEL, *Circuit Judge*: After concluding that unusually high prices in New York electricity markets resulted from a structural flaw in those markets, the operator of the state's power transmission system invoked its authority to lower the prices retroactively. A company that lost money because of these price reductions filed a complaint with the Federal Energy Regulatory Commission, arguing among other things that no structural flaw actually existed. The Commission rejected the company's challenge, but because it did so without adequately addressing the argument that in fact there was no market flaw, we grant the company's petition for review.

**I.**

As we explained not long ago, the New York Independent System Operator (NYISO)—a non-profit corporation and an intervenor in this case—oversees New York state's bulk-power transmission system. *See Consol. Edison Co. v. FERC*, 347 F.3d 964, 966 (D.C. Cir. 2003). Operating under tariffs filed with FERC, NYISO administers several bid-based electricity markets, including the "Day–Ahead Market" and the "Real–Time Market." *See Cent. Hudson Gas & Elec. Corp.*, 86 F.E.R.C. ¶ 61,062, 61,222–23 (1999). At the time of the events at issue in this case, NYISO's tariff empowered it to exercise what are known as "Temporary Extraordinary Procedures" (TEP) to correct "Market Design Flaws" in these two markets. *See N.Y. Indep. Sys. Operator, Inc.*, 90 F.E.R.C. ¶ 61,320, 62,065 (2000). The tariff authorized NYISO to invoke its TEP if prices deviated significantly from what they would have been in a working competitive market.

The tariff also stated, however, that "Market Design Flaws . . . do not include situations in which prices rise to levels based on demand and supply levels determined by efficient competition in periods of relative scarcity, or fall to levels based on demand and supply levels determined by efficient competition in periods of relative surplus."  Market Admin. & Control Area Servs. Tariff (Services Tariff), Attach. E at 2, *reprinted in* J.A. 71.

On May 8 and 9, 2000, a confluence of circumstances—including unexpectedly warm weather and pre-planned outages of several electricity generators—produced a strain in the Real–Time Market, with relatively high demand for electricity and a relatively low supply of it.  NYISO responded by dispatching (i.e., purchasing and using to satisfy consumer demand) electricity from the last available generator in the state, the Blenheim–Gilboa hydroelectric facility.  Blenheim's operator, the New York Power Authority (NYPA), had offered to sell Blenheim's electricity for $3,487 per megawatt-hour, and because that was the highest bid that NYISO accepted, it set the price for all electricity dispatched in the Real–Time Market during parts of the two days.  *See H.Q. Energy Servs., Inc. v. N.Y. Indep. Sys. Operator*, 100 F.E.R.C. ¶ 61,028, 61,071 (2002).

On May 12, NYISO invoked its TEP to reduce the Real–Time Market clearing price for May 8 from $3,487 per megawatt-hour to $331 per megawatt-hour, and for May 9 from roughly $3,000 per megawatt-hour to approximately $350 per megawatt-hour.  According to NYISO, it took this "Extraordinary Corrective Action" (the term used to refer to exercises of TEP) because NYPA's bid, and thus the clearing price, resulted from a Market Design Flaw.  The Blenheim facility, NYISO explained, had relatively little electricity available—so little that it qualified as an "energy limited resource," or ELR—and NYPA preferred not to sell that electricity on May 8 and 9 unless NYISO needed it in an emergency to guarantee system reliability.  A senior NYPA official explained that NYPA wanted "to refill the reservoirs of its pump-storage facilities . . . by avoiding energy production and engaging those units in pumping mode."  Aff. of

Robert J. Deasy, ¶ 4, *reprinted in* J.A. 140. If NYISO did need Blenheim's electricity to ensure system reliability, however, then NYPA, a state-owned, non-profit utility, was willing to sell the electricity at a relatively low price, "consistent with [its] historic practice" of "mak[ing] its resources available when they are needed to maintain the reliability of the . . . grid, and to do so at a reasonable cost to New York energy consumers." *Id.* ¶ 3. The market flaw, NYISO found, was that the bidding system prevented NYPA from submitting two bids to reflect these "complex preferences": a lower bid for emergency situations and a higher bid for non-emergency situations. According to NYISO, NYPA thus had to submit a single bid, one with a selling price much higher than what NYPA would have accepted if Blenheim's electricity was needed to maintain system reliability. Because NYPA's accepted bid, which set the market clearing price, was consequently much higher than it otherwise would have been, NYISO found it appropriate to invoke its TEP. In addition to lowering the clearing price for May 8 and 9, NYISO announced structural changes intended to prevent a repeat of the situation. *See H.Q. Energy Servs., Inc. v. N.Y. Indep. Sys. Operator*, 97 F.E.R.C. ¶ 61,218, 61,961 (2001) (explaining the changes).

Two electricity suppliers filed complaints with FERC, challenging NYISO's actions as beyond its TEP power. The first complaint focused on the May 8 price recalculation, while the second, from petitioner PSEG Energy Resources and Trade, focused on the May 9 recalculation—a recalculation that, according to the company, cost it $668,000. PSEG argued, among other things, that the market flaw that NYISO identified did not actually exist, that the May 9 market price may have reflected NYPA's opportunity costs or resulted from simple scarcity, and that even if the high price stemmed from a flaw, NYISO's choice of the proper clearing price was unjustified.

The Commission denied both complaints in a single order, rejecting the companies' various arguments and agreeing with NYISO that the high clearing price resulted from a flaw in the bidding system. "[T]he bidding rules' inability to allow

[ELR] units to reflect their operational constraints, and instead force such [entities] to guess at a bid level that would be high enough to avoid dispatch, is a market design flaw." *H.Q. Energy Servs.*, 97 F.E.R.C. at 61,964. FERC denied the companies' rehearing request. *See H.Q. Energy Servs.*, 100 F.E.R.C. at 61,076.

PSEG now petitions for review. "We review FERC orders under the Administrative Procedure Act's ... arbitrary and capricious standard," *Sithe/Independence Power Partners, L.P. v. FERC*, 165 F.3d 944, 948 (D.C. Cir. 1999), and give "substantial deference" to FERC's interpretation of ambiguous tariff language, *e.g.*, *Koch Gateway Pipeline Co. v. FERC*, 136 F.3d 810, 814 (D.C. Cir. 1998). If the tariff language is unambiguous, however, "this court need not defer to FERC's interpretation." *Idaho Power Co. v. FERC*, 312 F.3d 454, 461 (D.C. Cir. 2002). Moreover, although our "review of ratemaking decisions is highly deferential, FERC still must provide a coherent and adequate explanation of its decisions." *E. Tex. Elec. Coop., Inc. v. FERC*, 331 F.3d 131, 136 (D.C. Cir. 2003) (citation omitted).

## II.

We begin with PSEG's contention that there was no market flaw that could have justified NYISO's use of TEP authority. Although NYISO thought NYPA was unable to express its preferences under the existing bidding rules—a Market Design Flaw, as NYISO saw it—PSEG argues that while "[t]he NYPA unit was required to submit a bid into the Day–Ahead Market ... the ELR was not obligated, under any ISO rule or procedure existing on May 8, 2000 or May 9, 2000, to submit [a] real-time bid." Pet'r's Br. at 30–31. By not bidding in the Real–Time Market—or, more precisely, by withdrawing its Day–Ahead bid so that bid did not also serve as its Real–Time bid—NYPA, PSEG insists, could have ensured that NYISO would use Blenheim's electricity only to guarantee system reliability, exactly what NYPA wanted. Blenheim's electricity would have remained available to maintain system reliability because NYISO's tariff allowed it to

call on ELRs during emergencies even if they had not submitted a Real–Time Market bid. *See* Services Tariff, § 5.12.8(c) ("[T]he ISO may call on Energy Limited Resources at any time during emergencies."). Moreover, if after declining to submit a bid Blenheim had been called on in an emergency, then the price it received for its electricity would not have set the market clearing price. *See* Pet'r's Br. at 32 (explaining that under NYISO's Open Access Tariff, NYISO determines the clearing price "using Bids submitted into the Real–Time Market"). Because no flaw existed, PSEG concludes, NYISO had no authority to use its TEP.

Although the Commission rejects PSEG's argument, it never denies—not in its initial order, not in its rehearing order, not in its brief here, and not at oral argument—that NYPA could have withheld a bid from the Real–Time Market. Indeed, NYISO's own expert concedes that NYPA could have done so. *See* Aff. of Robert M. Thompson, ¶ 8, *reprinted in* J.A. 134 ("Under the bidding protocols in use on May 8, the operator of an ELR unit that did not want to, or was not able to, operate the unit at its full capacity during a given period was forced *either to withhold the unit entirely*, or to submit an offer calculated to be so high that the unit . . . would not be called upon for production under normal system conditions." (emphasis added)). In its initial order, moreover, FERC offered no answer at all to PSEG's argument that NYPA's ability to withhold a bid from the Real–Time Market meant that NYPA could have sent precisely the "complex signal" it wished. FERC did acknowledge the argument in its rehearing order, but said only this:

> [T]he Commission is not quick to second guess NYPA's actions. . . . NYPA's bidding strategy, developed in consultation with NYISO, had been working well enough even under NYISO's flawed bidding rules until May 8 and 9 . . . . And it is not easy to safely change a complex bidding strategy on a moment's notice to face entirely unforeseen circumstances.

100 F.E.R.C. at 61,074. The last sentence of this statement addresses PSEG's alternative argument that because Real–

Time Market bids can be changed until the last minute, NYPA could have lowered its bid once it became clear that NYISO might need Blenheim's electricity to maintain system reliability. Whether or not this sentence adequately answers that alternative argument, it does nothing to answer PSEG's assertion that no market flaw existed given NYPA's ability to express its preferences by withholding any bid from the Real–Time Market.

The first two sentences of FERC's statement do address PSEG's primary argument, but we think them wholly inadequate. That NYPA may have developed its bidding strategy—submitting very high bids when it did not want NYISO to dispatch its electricity—in consultation with NYISO simply suggests that NYPA was not alone in lacking awareness of its bidding options. It does not address PSEG's argument that the flaw on which NYISO based its Extraordinary Corrective Action was non-existent. And the fact that NYPA's strategy had been "working well enough" in normal circumstances cannot excuse NYPA's failure to prepare for abnormal conditions, for a bidding strategy's effectiveness during normal times does not necessarily indicate that it will be effective during unusual times. Just because people stay dry on sunny days despite always leaving their umbrellas at home does not mean they will stay dry the next time it rains.

FERC insists that "PSEG's years-later opinion of NYPA's possible bidding options is speculative at best; the ISO answered that NYPA believed at the time that it had no other means, under then-existing ISO bidding rules, to differentiate between normal and emergency circumstances." Resp't's Br. at 24. Setting aside the fact that this argument appears nowhere in the Commission's orders, we think it lacks merit. Not only is PSEG's specific and straightforward assertion far from "speculative," but the tariff's plain language contradicts the Commission's implicit claim that a bidder's ignorance of its options constitutes a Market Design Flaw. The tariff defines Market Design Flaw as "a market structure, market design or implementation flaw giving rise to situations in which market conditions or the application of ISO Procedures would result in inefficient markets or prices that would not be

produced in a workably competitive market." Services Tariff at 1, *reprinted in* J.A. 70. Because ignorance and other forms of imperfect information abound in most "workably competitive markets," there is no reason to think that the result here would not have been produced in a working market. Since the tariff's plain language precludes the possibility that a single bidder's ignorance can constitute a Market Design Flaw, "this court need not defer to FERC's interpretation." *Idaho Power*, 312 F.3d at 461.

Intervenors NYISO and the Consolidated Edison Company of New York offer several additional responses to PSEG's contention that no market flaw existed. For example, they argue that NYPA *did* have to submit a bid in the Real–Time Market because otherwise NYISO would have been unable to calculate NYPA's bid-production costs. But whether or not this argument is valid—and for now we have our doubts, since intervenors never explain why NYISO needed to calculate NYPA's bid-production costs—the argument, like intervenors' other arguments, was not offered by FERC in either of the orders under review. *See, e.g.*, *KeySpan-Ravenswood, LLC v. FERC*, 348 F.3d 1053, 1059 (D.C. Cir. 2003) ("[P]ost hoc salvage operations of counsel cannot overcome the inadequacy of the Commission's explanation." (internal quotation marks omitted)).

### III.

Because FERC's failure to respond cogently to PSEG's argument that no market flaw existed requires granting the company's petition, we have no need to resolve PSEG's other arguments. Since the Commission will have to conduct additional proceedings on remand, however, we think it appropriate to comment on FERC's response to PSEG's argument that NYPA's bid may have actually reflected its opportunity costs. Rejecting this argument, the Commission stated that "regardless of whether opportunity costs existed, NYISO's market was flawed [because] NYPA could not under the NYISO bidding rules submit the complex bid it sought to make, and nothing required NYISO to let a flawed bid set the

market price when it had TEP authority to correct the flaw." *H.Q. Energy Servs.*, 100 F.E.R.C. at 61,073. In our view, the suggestion that NYPA's inability to submit multiple bids, by itself, justified NYISO's invocation of its TEP authority reveals a misunderstanding of the tariff. The tariff defines a Market Design Flaw as a market structure or design that produces prices different than those that workably competitive markets would have produced. Under the tariff, then, market structures or designs that yield *normal* prices—i.e., prices that a workably competitive market would have produced—do not qualify as Market Design Flaws and thus do not warrant the use of TEP. Hence, contrary to FERC's statement that "nothing required NYISO to let a flawed bid set the market price when it had TEP authority to correct the flaw," the tariff itself required NYISO to "let a flawed bid set the market price" unless NYPA would have made a different bid absent any flaw. A market structure that co-existed with but had no effect on market-driven (including scarcity-driven or opportunity-cost-driven) prices could not justify the use of TEP. Without pre-judging issues unnecessary to resolve at this stage, we are skeptical that FERC could reach the same outcome on remand without addressing this issue and without saying more about why it rejected PSEG's opportunity-costs argument—particularly since the Commission has given no answer to PSEG's question of why NYPA chose the exact bid it did if not to reflect its opportunity costs.

## IV.

PSEG's petition for review is granted and the case is remanded to FERC for further proceedings consistent with this opinion.

*So ordered.*