# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued October 31, 2005      Decided December 2, 2005

No. 04-1341

FPL ENERGY MARCUS HOOK, L.P.,
PETITIONER

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

PJM INTERCONNECTION, L.L.C.,
INTERVENOR

---

On Petition for Review of Orders of the
Federal Energy Regulatory Commission

---

*Stephen L. Huntoon* argued the cause and filed the briefs for petitioner.

*Dennis Lane*, Former Solicitor, Federal Energy Regulatory Commission, argued the cause for respondent. With him on the brief was *Cynthia A. Marlette*, General Counsel.

*Barry S. Spector* argued the cause and filed the brief for intervenor. *Michael J. Thompson* entered an appearance.

Before: SENTELLE, GARLAND and GRIFFITH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* SENTELLE.

SENTELLE, *Circuit Judge*: FPL Energy Marcus Hook ("Marcus Hook") petitions for review of a Federal Energy Regulatory Commission ("FERC" or "the Commission") order denying a request for a reallocation and redetermination of Marcus Hook's cost responsibility for a construction upgrade resulting from its request to interconnect with an electricity transmission grid. Marcus Hook also petitions for review of FERC's order denying its request for rehearing. Because we find that FERC did not adequately explain its decision on the upgrade's system benefit, we grant the petition for review, partially vacate the orders, and remand for further proceedings.

I.

A.

Formed in 1927 in the Mid-Atlantic region, intervenor PJM Interconnection ("PJM") has operated since 1956 as a tight power pool, having a single control area with free-flowing transmission lines. *See Atl. City Elec. Co. v. FERC*, 295 F.3d 1, 5 (D.C. Cir. 2002). In 1996, FERC initiated "sweeping changes" in the electric utility industry, which led PJM to reorganize itself in 1997 as an independent system operator ("ISO"). *Mich. Pub. Power Agency v. FERC*, 405 F.3d 8, 10 (D.C. Cir. 2005). Adhering to FERC's regulations for ISOs, PJM adopted a pool-wide open access tariff and a regional bid-based energy market in 1997. *Id.* at 5.

Further changes in 2002 led FERC to designate PJM as the first regional transmission organization ("RTO"). *PJM Interconnection, LLC*, 101 FERC ¶ 61,345 (2002), *order on reh'g*, 104 FERC ¶ 61,124 (2003), *order on reh'g*, 105 FERC ¶ 61,123 (2003), *order on reh'g*, 109 FERC ¶ 61,067 (2004),

*reh'g pending*. As an RTO, PJM acts as an "umbrella entit[y]" that controls electricity transmission assets. *Mich. Pub. Power*, 405 F.3d at 10. Under FERC's new regime, electricity-generating plants can interconnect with transmission lines owned by RTOs and then sell energy to one another—a result favorable to competition. As administrative entities, RTOs and ISOs like PJM must handle the interconnections of new electricity generating facilities lying within the geography of their transmission-owning members. PJM's responsibilities included the interconnection of petitioner, whose project resides within the service area of PECO Energy Company, a transmission-owning member of PJM. The Marcus Hook project—a combined cycle, gas-fired, electric generating facility in Marcus Hook, Pennsylvania—entered service in late 2004.

The open access tariff provides the terms and conditions for all such interconnections under PJM's purview. The process begins when a new generating facility first approaches PJM and submits an interconnection request. That request must describe the new facility's size and location, among other things. Tariff Section 36.1. PJM then places all such requests into a first-come, first-served queue. Tariff Section 36.10.

The tariff requires PJM to undertake several studies of the queued projects. The first is a feasibility study, which preliminarily determines what system upgrades are necessary to accommodate the new interconnection. Tariff Section 36.2. From this study, PJM must estimate the requesting party's cost responsibility for the upgrades. Following the feasibility study, PJM must conduct a system impact study, which refines and more comprehensively estimates cost responsibility for necessary system upgrades. Tariff Section 36.4.1. Defined as "a comprehensive regional analysis of the effect" of a new interconnection, a single impact study may include an evaluation of multiple interconnection requests. *Id.* Customers may

terminate or withdraw their interconnection requests based on the impact study's findings. PJM then conducts a final facilities study on the remaining customers and allocates good faith estimates of cost responsibility among them. Tariff Section 36.7. Upon completion of the facilities study, PJM tenders to the interconnection customer an Interconnection Service Agreement ("ISA"), which specifies the customer's actual cost responsibility. Tariff Sections 36.8, 36.8.3, 37.4.

All cost figures produced by PJM's studies must comply with Section 37. Interconnection customers must pay for all necessary attachment facilities. Tariff Section 37.1. In addition, Section 37.2 imposes on the interconnection customer "100 percent of the costs of the minimum amount of [upgrades] necessary to accommodate its Generation Interconnection Request and that would not have been incurred under the Regional Transmission Expansion Plan but for such Generation Interconnection Request, net of benefits resulting from the construction of the upgrades . . . ." PJM prepares Regional Transmission Expansion Plans ("RTEPs"), which forecast "the enhancement and expansion of the Transmission System in order to meet the demands for firm transmission service in the PJM Region." Tariff Section 1.37A; *see also PJM Interconnection LLC*, 87 FERC ¶ 61,299, 62,202 n.40 (1999). The costs and benefits listed in Section 37.2 include costs and benefits "associated with accelerating, deferring, or eliminating" planned upgrades, upgrades resulting from modifications to the RTEP, and other upgrades that never become part of an RTEP.

Interconnecting facilities must meet milestones in order to maintain their place within the queue. Tariff Section 36.8.4(a); *see also id.* Section 36.8.5. Failure to meet a milestone or execute an ISA could trigger termination and withdrawal of the project. Tariff Section 36.8.4(c). Because the tariff allows PJM to evaluate multiple interconnection requests in a single study,

withdrawal of one request could affect the cost responsibility of other interconnection customers. Indeed, following a withdrawal, the tariff directs PJM to reevaluate upgrades previously deemed necessary by a facilities study that had evaluated multiple projects. *Id.* The tariff also directs PJM to redetermine cost responsibility for, and enter into an amended ISA with, customers remaining in the queue.

Following these tariff procedures for facilities interconnection, Marcus Hook submitted an interconnection request to PJM, which placed the project in queue position A21 with a queue date of August 17, 1998. It submitted another small request to PJM on October 22, 2001, which received a queue position of H6. PJM conducted the required feasibility, impact, and facilities studies for Marcus Hook's request.

The facilities study, most important for this case, evaluated the combined effect of Marcus Hook's A21 project and two other projects, queued with earlier priority at A13 and A19. According to the study, sufficient system capacity existed to support the A13 project, but the addition of A19 and A21 would push the system beyond the breaking point. To alleviate the capacity burden, PJM advised an upgrade to the Mickleton–Monroe circuit. Towers along that circuit had been built with a single transmission line but included unused positions for a second line; filling the open positions with a new transmission line would support the new interconnections, including Marcus Hook's. By recommending the upgrade, the facilities study revised the prior studies.

PJM estimated the cost of the Mickleton–Monroe upgrade at nearly $13 million. Because the upgrade was unnecessary at the time of the A13 request, that project escaped cost responsibility entirely. PJM therefore assigned the costs to the later-submitted projects, A19 and Marcus Hook's A21. On

January 20, 2002, PJM and Marcus Hook entered into an ISA, which saddled Marcus Hook with over $10 million of the upgrade's total cost. The balance fell to the A19 project.

Had the interconnections proceeded as forecasted in PJM's studies, this action would not have been brought. But, alas, the best-laid plans of mice and RTOs often go awry, and project A13 withdrew from the queue prematurely. The withdrawal presented PJM with an unexpected question: whether to complete the no-longer-necessary Mickleton–Monroe upgrade. PJM's studies of multiple interconnection requests had shown that the transmission system could support projects A19 and A21 without the Mickleton–Monroe upgrade. Scrapping the upgrade would therefore not harm the remaining projects. Economic concerns operated on the other side of the coin, however. At the time of A13's withdrawal, the upgrade was over ninety percent complete; removing the largely completed upgrade would not be an inexpensive undertaking. Judging completion to be the least costly alternative, PJM trudged forward and completed the upgrade.

## B.

Marcus Hook disputed its cost responsibility for what it considered to be an unnecessary project. Claiming that PJM had infringed Sections 36.8.4(c) and 37.2 of its tariff, Marcus Hook filed a complaint with FERC. As a remedy, Marcus Hook sought recompense from PJM for over $9 million, the sum total of its payments in support of the Mickleton–Monroe upgrade. To obtain its relief, Marcus Hook asked FERC to direct PJM to draw up a new, revised ISA with reduced cost responsibility for Marcus Hook. The complaint suggested that a favorable ruling would also require PJM to refund the difference between the original and amended ISAs, which Marcus Hook argued should be the entirety of the payments already made.

Marcus Hook grounded its complaint—and grounds its petition for review—in the language of PJM's tariff. Specifically, petitioner pointed to Section 36.8.4(c) of the tariff, the provision covering withdrawn interconnection requests. That section, in pertinent part, states:

> In the event that a terminated and withdrawn Interconnection Request was included in a [facilities study] that evaluated more than one Interconnection Request . . . [PJM] shall reevaluate the need for the facilities and upgrades indicated by the [facilities study], shall redetermine the cost responsibility of each remaining Interconnection Customer for the necessary facilities and upgrades based on its assigned priority . . . and shall enter into an amended [ISA] with each remaining Interconnection Customer setting forth its revised cost obligation.

Tariff Section 36.8.4(c). From this language, petitioner argued that, upon project A13's withdrawal, PJM was required to reevaluate the necessity of the Mickleton–Monroe upgrade, redetermine Marcus Hook's responsibility for the upgrade, and enter into an amended ISA with Marcus Hook based on the redetermination. Because PJM failed to perform any of these actions, petitioner asked FERC to order PJM to do so.

Petitioner Marcus Hook asserted that the upgrade is now unnecessary and that a reevaluation would so demonstrate. Indeed, Marcus Hook's complaint pointed to evidence that PJM itself considered the upgrade unnecessary in the absence of the A13 project. If the project is no longer necessary, Marcus Hook argued, then Section 37.2 of the tariff absolves it of cost responsibility. The section imposes "100 percent of the costs of the minimum amount of [upgrades] necessary to accommodate its Generation Interconnection Request and that would not have been incurred under the Regional Transmission Expansion Plan

but for such Generation Interconnection Request, net of benefits resulting from the construction of the upgrades . . . ." Tariff Section 37.2. Petitioner found here two textual hooks for its claim for relief: first, that it should not be responsible for unnecessary upgrades; second, that the upgrade's benefit to the system justifies shifting cost responsibility to another entity or entities.

FERC issued an order denying petitioner's request for relief. The Commission characterized the issue before it rather abstractly as "which entity bears the risk" of cost responsibility for upgrades made unnecessary by an earlier project's withdrawal. Concluding that the tariff places the risk on the interconnecting customer, FERC interpreted Section 36.8.4(c) to require PJM to redetermine necessity only for "as yet to be constructed" upgrades. FERC explained its interpretation by finding that PJM "could not" reallocate the costs to any other entity even if it reevaluated the necessity. The Commission suggested that Marcus Hook should have hedged its risk by negotiating safeguards into its ISA.

Having dispensed with PJM's ability to reevaluate and reallocate, FERC then rejected Marcus Hook's system benefit argument. Specifically, the Commission concluded that the Mickleton–Monroe upgrade lacked system benefit. FERC focused on language from Section 37.2, imposing on the customer costs "that would not have been incurred under the Regional Transmission Expansion Plan but for" the interconnection request. The Commission reasoned that the additional Mickleton–Monroe line had not been included in PJM's RTEP prior to Marcus Hook's interconnection request, and therefore lacked system benefit. FERC suggested that Marcus Hook would not have been responsible for any costs if the upgrade had appeared in the RTEP.

Marcus Hook filed for rehearing, challenging FERC's interpretation of the tariff and submitting additional evidence of the upgrade's system benefit. FERC denied the request for rehearing and issued another order. The Commission applied its own evidentiary rules to reject the additional evidence as untimely. *See* 18 C.F.R. § 385.206(8). According to FERC, the evidence should have appeared in Marcus Hook's original filings.

Revisiting its initial analysis of Section 36.8.4(c), FERC found that the tariff only allowed PJM to redetermine cost responsibility for "each remaining Interconnection Customer" whose interconnection request was included in the facilities study. The Commission concluded that there were no such remaining customers—that is, no projects remained in the queue to which PJM could reallocate any costs of the Mickleton–Monroe upgrade. Accordingly, as between Marcus Hook—the only relevant, remaining interconnection customer in the queue—and PJM, FERC affirmed its initial decision to allocate the risk to Marcus Hook. Necessity or the lack thereof, according to FERC, "does not change the allocation of risk under PJM's tariff."

The Commission also revisited the question of system benefit but relied on a different ground to reject Marcus Hook's rehearing argument. Rather than reach the merits as it had initially, FERC considered system benefit irrelevant to its analysis. The Commission reduced the issue to an either/or proposition: If the upgrade had been included in PJM's RTEP at the time of the interconnection request, the interconnecting customer would have no cost responsibility. If the upgrade did not appear in the RTEP, however, the customer would have sole responsibility for the costs. Because the Mickleton–Monroe upgrade did not appear in PJM's RTEP at the time Marcus Hook submitted its interconnection request, FERC concluded that

Marcus Hook retained its cost responsibility following A13's withdrawal.

Marcus Hook now petitions this court for review of FERC's initial order and the order denying rehearing.

## II.

This court reviews FERC's orders under the arbitrary and capricious standard. 5 U.S.C. § 706(2)(A); *see also PSEG Energy Res. & Trade LLC v. FERC*, 360 F.3d 200, 203 (D.C. Cir. 2004). Factual findings by FERC must be supported by substantial evidence. *Florida Mun. Power Agency v. FERC*, 411 F.3d 287, 291 (D.C. Cir. 2005). We "generally 'give[ ] substantial deference to [FERC's] interpretation of filed tariffs, even where the issue simply involves the proper construction of language.'" *S. Cal. Edison Co. v. FERC*, 415 F.3d 17, 21 (D.C. Cir. 2005) (quoting *Koch Gateway Pipeline Co. v. FERC*, 136 F.3d 810, 814 (D.C. Cir. 1998)) (second alteration in original). We need not defer, however, when the tariff is not ambiguous. *Id.* (citation omitted). Accordingly, the deference we apply is "*Chevron*-like" in nature. *Consol. Edison Co. of New York v. FERC*, 347 F.3d 964, 972 (D.C. Cir. 2003).

## III.

Petitioner's complaint essentially raises a single issue: What are PJM's duties under the tariff when a queued project withdraws and makes a previously necessary upgrade unnecessary? That single issue breaks down into several subparts: (1) whether PJM had a duty to reevaluate the completed Mickleton–Monroe upgrade at all; (2) to whom could PJM have reallocated costs should such a reallocation have been required; and (3) whether system benefit obviated Marcus Hook's cost responsibility even if reallocation to other

customers was not an option.

On the first question, FERC seems to have concluded that PJM has no duty at all to reevaluate the necessity of the Mickleton–Monroe upgrade. In its initial order, the Commission limited PJM's duty to reevaluate to "as yet to be constructed" upgrades. The parties have agreed that, as a "virtually completed" upgrade, the Mickleton–Monroe upgrade was no longer "as yet to be constructed." FERC's statements therefore suggest that PJM had no duty to reevaluate the need for the upgrade. Marcus Hook certainly interprets the order that way and spends considerable space in its briefs refuting what it believes to be FERC's holding.

Confusingly, though, FERC does not appear to have rested its decision on PJM's lack of duty. Rather, the Commission's initial order immediately ties PJM's duty to reevaluate to PJM's ability to reallocate costs following a reevaluation. Furthermore, the Commission's rehearing order does not even obliquely discuss PJM's basic duty to reevaluate the need for upgrades, a rather conspicuous omission. The rehearing order instead focuses exclusively on PJM's ability to reallocate. However unclear FERC's orders may otherwise be, it is certainly clear from such omissions that FERC did not hold that PJM had no duty to reevaluate the necessity of the upgrade. Accordingly, if we were to uphold the Commission's orders, it could not be on this basis. *See Missouri Pub. Serv. Comm'n v. FERC*, 234 F.3d 36, 41 (D.C. Cir. 2000) (stating court can only uphold agency action on "the grounds invoked by the agency" (citation and internal quotation marks omitted)). We note also that the Commission has not refashioned its holding before this court. FERC's brief barely addresses the "as yet to be constructed" language, which it says "merely characterize[s] how the Tariff's interconnection procedures work." This language confirms our conclusion that the Commission's orders assume a duty to

reevaluate under Section 36.8.4(c).

As to the second question, the Commission's orders question PJM's ability to reallocate the costs of the Mickleton–Monroe upgrade. Section 36.8.4(c) states that PJM "shall redetermine the cost responsibility of each remaining Interconnection Customer for the necessary facilities and upgrades based on" queue position. FERC concluded that, under this language, PJM *could not* have reallocated costs to any other customer. The initial order suggests that the upgrade's costs could have been reallocated only had the upgrade been "of value to other parties seeking capacity." The rehearing order clarifies this reasoning and states that upgrade costs could "be reallocated among the projects lower down in the queue" that would also use the upgrade's additional capacity. Applying this interpretation, the Commission concluded that the queue held no lower projects to which PJM could reallocate the upgrade's costs. Because of Marcus Hook's position in the queue, FERC found that it continues to bear the cost responsibility for the Mickleton–Monroe upgrade.

Marcus Hook apparently does not challenge the Commission's findings or reasoning on PJM's ability to reallocate to other interconnection customers. Petitioner instead focuses on the initial order's apparent limitation on PJM's duty to reevaluate to "as yet to be constructed" upgrades. Beyond its reevaluation argument, petitioner dedicates only one paragraph in its initial brief to the reallocation of costs among remaining customers. That paragraph, though, centers on which costs must be reallocated, not which customers remain in the queue. Petitioner's reply brief merely mimics its opening brief. As we have determined, FERC's orders assume that PJM had a duty to reevaluate; therefore, Marcus Hook's silence on the issue of reallocation does not aid our analysis.

Although the tariff's language is somewhat ambiguous, the text of Section 36.8.4(c) reasonably supports the Commission's holding. PJM must "redetermine the cost responsibility of each *remaining* Interconnection Customer" for necessary upgrades based on queue position. Tariff Section 36.8.4(c) (emphasis added). The Section reiterates the same language in the next clause, requiring amended ISAs for "each remaining Interconnection Customer." Several other tariff provisions, listed in FERC's rehearing order, also require a reallocation of costs among "remaining" customers. Other than Marcus Hook's meager references in its briefs, it offers no counter-interpretation of these provisions. Given the tariff's consistent focus on remaining customers and their queue positions—and Marcus Hook's lack of argument to the contrary—we cannot say the Commission unreasonably interpreted the tariff. *Consol. Edison*, 347 F.3d at 975.

With respect to the third question, FERC's two orders reach the same conclusion by two different routes. In its initial order, the Commission found that the Mickleton–Monroe upgrade lacked system benefit because it had not been included in PJM's RTEP. The rehearing order took a different tack, concluding that FERC "need not reach the merits." The Commission stated that Section 37.2 of the tariff makes Marcus Hook responsible for all of the costs of upgrades not part of the RTEP and none of the costs of upgrades included in the RTEP. Thus, according to FERC, actual benefit provided to the system is "irrelevant" to Marcus Hook's cost responsibility.

Faced with FERC's dual findings, Marcus Hook asserts both that system benefit is relevant to its complaint and that the Mickleton–Monroe upgrade had system benefit. Indeed, petitioner expressed confusion over whether the Commission's relevance rationale was "evidentiary" or legal in nature. At least partly because of the shifting rationales, we too are uncertain as

to how FERC reached its decision here. It is clear the two orders share one common element, a stress on the importance of PJM's RTEP to the issue of system benefit. The orders differ, however, on why the RTEP was important. In its rehearing order, the Commission changed its analysis from a merits inquiry to a relevance inquiry.

The inability to settle on a single rationale casts doubt on FERC's disposition of the action. The Commission's failure to explain the reason for its differing rationales raises more serious questions. We hold that FERC's failure to provide an intelligible explanation for adopting its new rationale amounts to a failure to engage in reasoned decisionmaking. *See Pub. Utils. Comm'n of Cal. v. FERC*, 988 F.2d 154, 167 (D.C. Cir. 1993) (agency determination must be result of reasoned decisionmaking).

We also doubt seriously whether either order's reasoning, standing alone, would withstand scrutiny. In addition to conflicting with each other, neither order adequately explains the link between PJM's RTEP and the question of system benefit. In its rehearing order, FERC did not even cite to Section 37.2—or any other tariff provision—in its discussion of system benefit. It is not clear on what part of the tariff the Commission hangs its reasoning. And though we grant the Commission considerable deference in its interpretation of ambiguous tariff language, we can only uphold the Commission's interpretation if we can "discern a reasoned path" to the decision. *E. Tex. Elec. Coop. v. FERC*, 218 F.3d 750, 755 (D.C. Cir. 2000) (quoting *K N Energy, Inc. v. FERC*, 968 F.2d 1295, 1303-04 (D.C. Cir. 1992)). We can discern no such reasoned path.

In addition, FERC's interpretation of the tariff also appears flawed. In its analysis of the role of system benefit to cost

allocation, FERC failed to consider the full text of Section 37.2. The Commission correctly recognized that necessity and "but for" causation are two essential elements of the cost responsibility calculus under Section 37.2; it failed, however, to acknowledge the remainder of the section. It is true that the tariff imposes on interconnection customers "100 percent of the costs" of upgrades meeting those two elements, but the tariff also reduces the customer's cost responsibility by the amount of "benefits resulting from the . . . upgrades." Tariff Section 37.2. Accordingly, this key language requires PJM to subtract system benefit from the interconnection customer's cost responsibility. The Commission inexplicably ignored this language and did not explain why PJM's RTEP should apply on the benefit side of the equation.

Section 37.2 also provides examples of costs and benefits that may be considered when assigning cost responsibility. According to the language of the section, applicable benefits may include those in an RTEP, those placed in a modified RTEP, and those that *never* become part of an RTEP. From this provision, we find it difficult to conclude that system benefit is the either/or proposition that FERC makes it out to be, and FERC's minimalist explanation does not allow us to defer to its expertise. Nothing in its orders adequately explains why PJM's RTEP should be the sole dispositive factor for Marcus Hook's cost responsibility in this case. Accordingly, "we remand to FERC for further consideration . . . in light of the entire" tariff section. *Office of Consumers' Counsel v. FERC*, 783 F.2d 206, 223 (D.C. Cir. 1986).

Because we find that FERC has not adequately explained its reasoning on the system benefit issue, we need not address Marcus Hook's further challenge to the Commission's rejection of its additional evidence.

16

IV.

Because we find that FERC did not adequately explain its decision on system benefit, we grant the petition for review, partially vacate FERC's orders, and remand for further proceedings.

*It is so ordered.*