# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued December 13, 2007      Decided February 29, 2008

No. 06-1326

OLD DOMINION ELECTRIC COOPERATIVE, INC.,
PETITIONER

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

PJM INTERCONNECTION, L.L.C., ET AL.,
INTERVENORS

Consolidated with
06-1331

On Petitions for Review of Orders of the
Federal Energy Regulatory Commission

*William D. DeGrandis* argued the cause for petitioners. With him on the briefs were *Bruce D. Ryan*, *Dennis Lane*, and *Glen L. Ortman*.

*Carol J. Banta*, Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. On the brief was *John S. Moot*, General Counsel.

*A. Karen Hill*, *Donald A. Kaplan*, and *John Longstreth* were on the brief for intervenors PPL Electric Utilities Corporation and Exelon Corporation in support of respondent.

Before: SENTELLE, *Chief Judge*, and GINSBURG and GARLAND, *Circuit Judges*.

Opinion for the Court filed by *Chief Judge* SENTELLE.

SENTELLE, *Chief Judge*:  CED Rock Springs, LLC ("Rock Springs") and Old Dominion Electric Cooperative ("Old Dominion") (together, "Petitioners") petition for review of a Federal Energy Regulatory Commission ("FERC" or "the Commission") order rejecting their rate filings under section 205 of the Federal Power Act ("FPA"), 16 U.S.C. § 824d.  They also petition for review of FERC's order denying their request for rehearing.  Because we conclude that the Commission adequately explained its decision to deny Petitioners' rate filings and its decision was not unduly discriminatory, we deny their petition for review.

## I.  Background

In 1998, Petitioner Old Dominion began planning the construction and development of a natural gas-fired combustion turbine generating facility to be located in Rising Sun, Maryland.  The facility is now complete and consists of four generation units—two owned by Old Dominion and two by Petitioner Rock Springs—and transmission facilities consisting of a 500 kV substation and two 900-foot 500 kV transmission lines jointly owned by Petitioners.  Petitioners connected their generators to the electrical grid first by running radial lines from their generators to the substation.  They then looped their two 900-foot transmission lines from the substation to a 500 kV transmission line owned by PECO Energy Company ("PECO").

Electricity flows freely from other generation facilities through PECO's transmission lines, and subsequently, through Petitioners' substation and two 900-foot lines. Electricity produced by Petitioners' generators only flows out from the generators onto the transmission grid via the radial lines that connect their generators to the substation. In other words, Petitioners' substation and two looped 900-foot 500 kV lines are fully integrated in the electrical grid; Petitioners' generators are not.

PJM Transmission System ("PJM") is a regional, interconnected transmission grid composed of transmission and generation facilities owned by Petitioners, PECO, and others. All owners of generation and transmission facilities in the PJM Transmission System are parties to the PJM Interconnection L.L.C. Open Access Transmission Tariff ("Tariff"). The Tariff establishes the rates, terms, and conditions of service for transmission services over the PJM Transmission System. The Tariff also requires an Interconnection Customer, a generator that needs to connect to the PJM Transmission System,

> to pay for 100 percent of the costs of the minimum amount of . . . Network Upgrades necessary to accommodate its Interconnection Request and that would not have been incurred . . . but for such Interconnection Request, net of benefits resulting from the construction of the upgrades, such cost not to be less than zero.

Tariff § 37.2.

During construction of the Rock Springs and Old Dominion generating facilities, Petitioners submitted an Interconnection Request as set forth in the Tariff for PECO to connect their generators to the PJM Transmission System. PECO indicated

to Petitioners that it would be unable to build the interconnection facilities on the schedule that they preferred, so instead of waiting for PECO to build the facilities, they opted to build them themselves. Petitioners then began construction on the 500 kV substation and two 900-foot 500 kV lines that now connect their generators to the PJM Transmission System. If PECO had built the interconnection facilities, the Tariff would have allocated the cost to Petitioners minus any benefit to the PJM Transmission System, and PECO would have owned the interconnection facilities. Tariff § 37.2; *id.* § 40.1 ("Except to the extent otherwise provided in a Construction Service Agreement entered into pursuant to Subpart F below, the Transmission Owners shall own all Attachment Facilities, Local Upgrades, and Network Upgrades constructed to accommodate Interconnection Requests."). However, Petitioners built the interconnection facilities themselves, so they each own a one-half share in the substation and 1,800 feet of transmission line, making them Transmission Owners ("TOs"). Because Petitioners are TOs and not simply owners of generation facilities, in addition to being parties to the Tariff, they are also parties to the Transmission Owners' Agreement ("TOA").

Prior to signing the TOA, the relationship between PJM and Petitioners was governed by a Facilities Operation Agreement ("FOA"), a contract written to address Petitioners' unique position as both generation owners and TOs. Because Petitioners wanted to preserve their status as Exempt Wholesale Generators ("EWGs") under the Public Utility Holding Company Act of 1935 ("PUHCA"), 15 U.S.C. §§ 79a *et seq.*, repealed by the Energy Policy Act of 2005, Pub. L. No. 109-58, 119 Stat. 594, the FOA included a provision that waived their right to receive any revenue that "PJM may collect for transmission services for which PJM may use the Facility . . . ." FOA § 5.1.5. But other TOs were not satisfied with the FOA, so the parties modified the TOA to allow Rock Springs and Old

Dominion to opt out of cost recovery. The modified TOA gives each party "the right at any time unilaterally to file pursuant to Section 205 of the Federal Power Act to change the revenue requirements underlying its rates for providing services under the PJM Tariff." TOA § 2.2.1. The next sentence addresses Petitioners' EWG concerns and gives each party "the unilateral right to adopt a revenue requirement *of zero* and to forgo any right or claim to compensation for providing transmission services under the PJM Tariff or any other document." *Id.* (emphasis added). Section 2.2 of the TOA states that "[n]otwithstanding any other provision of this Agreement, or any other agreement or amendment made in connection with the restructuring of PJM, each individual Party shall retain all of the rights set forth in this Section 2.2 . . . ."

Later FERC orders and the repeal of the Public Utility Holding Company Act of 1935 assuaged Petitioners' concerns about their EWG status. As a result, Rock Springs and Old Dominion filed petitions with FERC to recover operating and management expenses, depreciation expenses, property taxes, and return on equity for their substation and 1,800 feet of transmission line. Old Dominion Elec. Coop., Filing of Transmission Revenue Requirement Rate Application and Tariff Revisions, at 6, Docket No. ER06-497-000 (Jan. 17, 2006). These figures represent "the portion of plant costs attributable to the two 900-foot transmission lines and related 500 kV substation," along with operating expenses for these facilities. CED Rock Springs, LLC, Filing of Transmission Revenue Requirement Rate Application and Tariff Revisions, at 8, Docket No. ER06-497-000 (Jan. 17, 2006).

FERC rejected Petitioners' rate filings in full. *CED Rock Springs, LLC, et al.*, 114 FERC ¶ 61,285 (Mar. 17, 2006) ("*Order Rejecting Rate Filings*"). The Commission concluded that Section 37.2 of the Tariff, which assigns to Generation

Interconnection Customers the cost of Network Upgrades that "would not have been necessary but for the generation project and that do not provide benefits to the transmission grid," precluded Petitioners from recovering the cost of building their interconnection facilities. *Id.* at 61,961; *see id.* at 61,961–62. Because Petitioners demonstrated no "but for" benefits to the PJM Transmission System, FERC determined that the Tariff foreclosed Petitioners from recovering their interconnection costs from transmission revenue. *Id.* at 61,962. FERC also found that Section 2.2 of the TOA and Section 9.1(a) of the Tariff, which reserve a TO's right to file for transmission service revenue under section 205 of the FPA, do not override "the express allocation of costs under section 37." *Id.* at 61,962; *see id.* at 61,962–64. In addition, FERC noted that in an earlier filing, Petitioners expressly disclaimed any right to receive transmission revenue from their facilities. *Id.* at 61,964; *see* Old Dominion's and Rock Springs's Request for Expedited Order Confirming Compliance with Order Nos. 888 and 889, at 3, 11 & 12, Docket No. OA02-9-000 (Aug. 30, 2002). FERC noted that it had even issued an order in response to that filing stating that "'[w]hen Applicants' transmission facilities provide transmission service to PJM's customers, Applicants will receive no transmission revenue,'" for which Petitioners never requested rehearing. *Order Rejecting Rate Filings*, 114 FERC at 61,964 (quoting *CED Rock Springs, Inc., et al.*, 101 FERC ¶ 61,325, 62,353 (Dec. 20, 2002)).

Petitioners were not satisfied with FERC's initial order so they sought rehearing, which FERC denied. *CED Rock Springs, LLC, et al.*, 116 FERC ¶ 61,163 (Aug. 22, 2006) ("*Order Denying Rehearing*"). As in the first order, FERC determined that because Petitioners put forth no evidence that their interconnection facilities were necessary "but for" their interconnection request, Section 37.2 bars Petitioners from recovering the costs of those facilities through transmission

revenue. *Id.* at 61,705. FERC noted that, despite Petitioners' assertions to the contrary, they cited no case in which "similarly situated projects . . . have been treated differently." *Id.* at 61,706.

Rock Springs and Old Dominion now petition this court for review of FERC's initial order and its order denying rehearing.

## II. Analysis

We grant substantial deference to FERC's orders, setting them aside only if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see also FPL Energy Marcus Hook, L.P. v. FERC*, 430 F.3d 441, 446 (D.C. Cir. 2005). Under this deferential standard of review we uphold orders in which we can "discern a reasoned path" to the decision. *FPL Energy Marcus Hook*, 430 F.3d at 449 (internal citations and quotations omitted).

This Court also "generally gives substantial deference to [FERC's] interpretation of filed tariffs, even where the issue simply involves the proper construction of language." *S. Cal. Edison Co. v. FERC*, 415 F.3d 17, 21 (D.C. Cir. 2005) (internal citation and quotations omitted). However, we do not defer to FERC's interpretation when the tariff language is unambiguous. *FPL Energy Marcus Hook*, 430 F.3d at 446. This level of review is "*Chevron*-like" in nature. *Consol. Edison Co. of N.Y. v. FERC*, 347 F.3d 964, 972 (D.C. Cir. 2003); *see Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984).

Petitioners ask this Court to review *de novo* FERC's interpretation of the Tariff and the TOA based on their conclusion that FERC found the language in the relevant documents to be unambiguous. It is true that "[a]n agency is

given no deference at all on the question whether a statute is ambiguous, and if an agency erroneously contends that Congress' intent has been clearly expressed and has rested on that ground, we remand to require the agency to consider the question afresh in light of the ambiguity we see." *Cajun Elec. Power Coop., Inc. v. FERC*, 924 F.2d 1132, 1136 (D.C. Cir. 1991). In this case, however, FERC considered policy concerns and extrinsic evidence proffered by Petitioners, demonstrating it recognized the Tariff and the TOA were ambiguous and exercised its discretion to resolve the ambiguities. *See Order Rejecting Rate Filings*, 114 FERC at 61,962-64; *Order Denying Rehearing*, 116 FERC at 61,704. Therefore, we afford substantial deference to the Commission's interpretation of the relevant contract language. *See Chevron*, 467 U.S. at 842-43; *Koch Gateway Pipeline Co. v. FERC*, 136 F.3d 810, 814-15 (D.C. Cir. 1998).

## A. Network Upgrades

Petitioners first argue that Section 37.2 of the Tariff does not apply to their rate filing because their substation and 1,800 feet of transmission line are not Network Upgrades. Petitioners contest FERC's classification of their transmission facilities as Network Upgrades for two reasons: one, transmission facilities cannot also be classified as Network Upgrades; and two, no document refers to their transmission facilities as Network Upgrades, while other facilities were expressly defined as "Network Upgrades."

In order for Section 37.2 to apply to Petitioners' rate filings, their interconnection facilities must be either Local Upgrades or Network Upgrades. Tariff § 37.2 (referring only to payment responsibility for Network and Local Upgrades). Network Upgrades are defined as "[m]odifications or additions to transmission-related facilities that are integrated with and

support the Transmission Provider's overall Transmission System for the general benefit of all users of such Transmission System." Tariff § 1.26. Petitioners do not object to FERC's acknowledgment that even Petitioners "recognize[] the facilities they own are modifications and additions to the existing" transmission system, an admission that plainly places them in the category of Network Upgrades. *Order Denying Rehearing*, 116 FERC at 61,702. Petitioners contend only that because their facilities are transmission facilities, they cannot also be Network Upgrades.

FERC sensibly rejected this either/or contention, determining that Network Upgrades can also serve as transmission facilities and noting that the Tariff makes "no distinction . . . between network upgrades and transmission facilities." *Id.* FERC also reasonably found that the lack of designation of these facilities as Network Upgrades in the TOA or Tariff or any other part of the record is irrelevant. *Id.* at 61,703. The only reason for designating the facilities in such a way would be to ensure that Petitioners "repay" another entity for the cost of constructing the facilities. *Id.* There was no reason to designate Petitioners' facilities as Network Upgrades when Petitioners were already paying for the construction costs themselves.

## B.  Generation Interconnection Customers

Petitioners also claim that Section 37.2 does not apply to them because they are not "ordinary" Generation Interconnection Customers ("GICs"). Request for Rehearing of CED Rock Springs, LLC, at 13–14, Docket No. ER06-491-001 (Apr. 14, 2006); *see also* Request for Rehearing of Old Dominion Elec. Coop., at 12–13, Docket No. ER06-497-000 (Apr. 17, 2006). A GIC is defined as "[a]n entity that submits an Interconnection Request to interconnect a new generation

facility . . . with the Transmission System in the PJM Region." Tariff § 1.13B. Petitioners do not contest that they submitted an Interconnection Request as required under the Tariff. PJM Filing of Interconnection Service Agreement with Rock Springs, Old Dominion and Rock Springs Generation and the FOA, at 3, Docket No. ER02-1726 (May 6, 2002). Nor do they contest that instead of waiting for PJM to construct the interconnection facilities, Petitioners and PJM entered into an Interconnection Agreement and a FOA that referred to Petitioners' substation as an "Interconnection Substation" and their 1,800 feet of 500 kV transmission line as "interconnection facilities." *Id.* at 5–6; FOA § 1.1. Instead, Petitioners argue that they cannot be GICs because they are TOs, and, according to Petitioners, TOs cannot also be GICs. For support, they present an excerpt from a transmittal letter PECO sent to FERC upon filing its Interconnection Agreement:

> The subject Interconnection Agreement establishes the requirements, terms, and conditions for the interconnection of Rock Springs/CED's Transmission Facilities with PECO's Transmission Facilities, and defines the continuing responsibilities and obligations of the parties as transmission owners of interconnected transmission facilities. . . .

> The Interconnection Agreement differs from other interconnection agreements recently filed by PECO because it is between two transmission owners, as opposed to between a transmission owner and a generator. . . . PJM's standardized tariff for generation interconnection is also designed to address the interconnection of new generation stations to transmission facilities, and does not address the unique situation presented here.

PECO Energy Co., Filing of Interconnection Agreement with PECO, Old Dominion and Rock Springs, at 3, Docket No. ER02-1779 (May 9, 2002).

FERC adequately responded to Petitioners' attempt to dichotomize TOs and GICs by relying on the definition of a GIC and examining it in light of the policy underlying Section 37.2. The Commission found that GIC "is defined without limitation" and "applies regardless of whether the interconnection customer is also a transmission owner." *Order Rejecting Rate Filings*, 114 FERC at 61,962. FERC noted that the policy underlying Section 37.2, which is "to promote efficient interconnection and enhance overall economic efficiency . . . would be undermined by requiring generators initially to pay their interconnection costs and allowing generators then to allocate those costs to transmission service customers." *Id.*; *see also Order Denying Rehearing*, 116 FERC at 61,702 ("Allocation of cost responsibility under section 37.2 does not depend on which party chose to build facilities, but rather on whether the facilities would have been built 'but for' the generation interconnection project."). In response to the excerpted letter, FERC reasonably noted that creating an Interconnection Agreement when parties rearrange ownership and operational arrangements "is both expected, and under the [Tariff], irrelevant." *Order Denying Rehearing*, 116 FERC at 61,701 n.10. We find that FERC's reasoning adequately explains why Petitioners are classified as GICs.

## C. "But For" Facilities

Because FERC reasonably determined that Petitioners' interconnection facilities are Network Upgrades and that Petitioners are GICs, it was reasonable for the Commission to apply the cost responsibility provisions in Section 37.2 of the Tariff. Section 37.2 of the Tariff assigns to the Interconnection

Customer "100 percent of the costs of the minimum amount of . . . Network Upgrades necessary to accommodate [an Interconnection Customer's] Interconnection Request and that would not have been incurred under the Regional Transmission Expansion Plan but for such Interconnection Request, net of benefits resulting from the construction of the upgrades . . . ."

Interpreting Section 37.2 in light of the provision's language and the relevant policy considerations, FERC found that it "determines cost responsibility based not on electrical integration (whether the facilities operate as transmission facilities) or ownership, but rather on whether the connection facilities would have been built for another purpose or enable the system to avoid certain expenditures." *Order Denying Rehearing*, 116 FERC at 61,701. To read the provision to allow GICs to recoup interconnection costs through transmission revenue would undermine the Commission's policy "to promote efficient interconnection and enhance overall economic efficiency" and "defeat the purpose of Order No. 2003 to treat generation interconnections built by transmission owners differently from other generation interconnections." *Order Rejecting Rate Filings*, 114 FERC at 61,962. FERC found no evidence that Petitioners' interconnection facilities would have been built but for their need to connect to the transmission grid. *Order Denying Rehearing*, 116 FERC at 61,705. Because Section 37.2 assigns to the GIC 100 percent of the costs of interconnection when facilities would not have been built but for the interconnection request, FERC denied Petitioners' request to recoup these expenditures through transmission revenue. *Id.*

On appeal, Petitioners make several allusions to services their transmission facilities now provide to the grid, but they still point to no evidence in the record that the PJM Transmission System would have built facilities to provide these services in the absence of Petitioners' need to connect to the grid. While

Petitioners contend that FERC refused "to acknowledge the benefits of increased reliability and flexibility" to the grid their facilities provide, Petitioners' Br. at 26, the presence or absence of these purported benefits is not controlling. The allocation of costs under Section 37.2 depends on the grid's demonstrated need for interconnection facilities, not the incidental services or benefits any given interconnection facility may provide once it is built. The same reasoning applies to explain why the future cost of a $200,000 wave trap replacement and other unquantified costs associated with complying with TOA regulations, Request for Rehearing of Old Dominion Elec. Coop., at 26, Docket No. ER06-497-000 (Apr. 17, 2006), are not evidence that the facilities would have been built but for their interconnection request. FERC adequately responded to this argument, asserting that "these costs resulted from [Petitioners'] choice to build and own these facilities[,]" not from any demonstrated need by the system. *Order Denying Rehearing*, 116 FERC at 61,702. And while the 500 kV capacity of their substation and transmission lines more than doubles the maximum output of their generation units, this additional capacity is not evidence that the PJM Transmission System would have added facilities such as these absent Petitioners' need to interconnect. FERC reasonably attributed this extra capacity to the need for the interconnection facilities to match the transmission capacity of the grid so as not to adversely affect the reliability of the grid. *Order Denying Rehearing*, 116 FERC at 61,705. Because Section 37.2 requires evidence that facilities would have been built "but for" a GIC's need to interconnect for the GIC to receive any credit towards interconnection construction costs, FERC reasonably assigned to Petitioners 100 percent of interconnection costs and denied their rate filing for reimbursement of these costs.

### D. TOA § 2.2 and Tariff § 9.1(a)

Despite the language in Section 37.2 of the Tariff that precludes cost recovery for Petitioners' interconnection facilities, Petitioners contend that Section 2.2 of the TOA and Section 9.1(a) of the Tariff override Section 37.2's applicability. Section 2.2 of the TOA states that "[n]otwithstanding any other provision of this Agreement . . . each individual Party shall retain all of the rights set forth in this Section 2.2." The rights set forth in Section 2.2 include "the right at any time unilaterally to file pursuant to Section 205 of the Federal Power Act to change the revenue requirements underlying its rates for providing services under the PJM Tariff" and "the unilateral right to adopt a revenue requirement of zero and to forgo any right or claim to compensation for providing transmission services under the PJM Tariff . . . ." TOA § 2.2.1. Section 9.1(a) of the Tariff states:

> [t]he Transmission Owners shall have the exclusive and unilateral rights to file pursuant to Section 205 of the Federal Power Act . . . for any changes in or relating to the establishment and recovery of the Transmission Owners' transmission revenue requirements or the transmission rate design under the PJM Tariff, and such filing rights shall also encompass any provisions of the PJM Tariff governing the recovery of transmission-related costs incurred by the Transmission Owners.

Petitioners claim that the language in these provisions unambiguously gives Petitioners the right to recover revenue for their interconnection facilities through their rate filings despite contrary language in Section 37.2 of the Tariff. Petitioners contend that any contrary conclusion would make Section 2.2.1 of the TOA meaningless. They also claim that Section 2.2.1, language not present in the parties' prior agreement, served as

their *quid pro quo* for taking on the additional responsibilities that TOA signatories incur. Such responsibilities include, *inter alia*, complying with FERC Standards of Conduct and curtailing transmission facility operation when instructed by PJM.

In response to Petitioners' argument about the significance of Section 2.2 of the TOA and Section 9.1(a) of the Tariff, FERC found that the provisions are simply reservations of rights that "permit[] the utility only to submit a filing to recover costs." *Order Denying Rehearing*, 116 FERC at 61,703. "Whether such costs can be recovered, and from whom, depends upon an analysis of the [Tariff] and the benefits, if any, that such costs provide to other parties." *Id.* FERC further stated that Section 2.2.1 of the TOA, which allows a party to "adopt a revenue requirement of zero," does not grant the converse affirmative right to receive the revenue that Petitioners seek. *Id.* at 61,704. A party to the TOA may apply for revenue, as the provision allows, but it does not require FERC to accept an application for revenue that other parts of the TOA and Tariff prohibit. *Id.* We find no problem with the Commission's reasoning.

Petitioners claim that FERC's interpretation of Section 2.2.1 of the TOA to provide a unilateral right to file for revenue but not to include an affirmative right to receive revenue renders the provision meaningless. In Petitioners' view, if they can file for revenue and FERC can reject their filing, then Section 2.2.1 provides no right at all. But Petitioners ignore the fact that they can file, and if the filing is not prohibited by another section of the TOA or the Tariff, then they can receive the revenue to which they are entitled. The provision operates in the same way for every signatory to the TOA, giving each party an equal right to file. Furthermore, Section 2.2.1's right to forego compensation, the language that Petitioners urged the parties to the TOA to adopt, also had a tangible meaning to Petitioners. As FERC aptly stated, "section 2.2.1 merely ensures that each

owner may decide *unilaterally* to forgo any compensation to which the owner might be entitled, notwithstanding the joint filings contemplated under the PJM agreements." *Order Denying Rehearing*, 116 FERC at 61,704. This provision allowed Petitioners to comply with the now-repealed PUHCA. Contrary to Petitioners' assertion, Section 2.2.1 has meaning and provides Petitioners with the right to recover revenue if they can show their transmission facilities provide net benefits to the system.

The extrinsic evidence that Petitioners present to support their *quid pro quo* theory is inapposite in light of the fact that the TOA only confers a "right at any time unilaterally to file" for revenue, not to receive it. TOA § 2.1.1. There is no reason for FERC to accord determinative weight to extrinsic evidence of one party's expectations, particularly when the contract language provides for no such right. *See Order Denying Rehearing*, 116 FERC at 61,704 ("[E]xtrinsic evidence cannot overcome the provisions of the [Tariff] that do not permit such recovery."]. As FERC noted, "the affidavit never states that the other parties were ever aware of, or agreed to, Rock Springs' or Old Dominion's right to recover these costs from other transmission customers." *Id.* It is reasonable for the Commission to discount extrinsic evidence of one party's "personal understanding of the contractual terms rather than its objective meaning." *Amerada Hess Pipeline Corp. v. FERC*, 117 F.3d 596, 606 (D.C. Cir. 1997). We further note that just as the parties to the TOA derived no benefit from Old Dominion's new transmission lines, those parties derived no benefit from the additional expenses Old Dominion incurred as a result of signing the TOA. Therefore, there is no reason they would have agreed to permit Old Dominion to recover revenue in exchange for Old Dominion shouldering those regulatory burdens.

## E. Undue Discrimination

Last, Petitioners assert that FERC's interpretation of Section 37.2 of the Tariff to preclude them from recovering the cost of building their interconnection facilities through transmission revenue is unduly discriminatory. Referring to a spreadsheet they created and titled, "PECO Comparable Facilities Included in PJM OATT Rates," they claim that PECO, another owner of transmission facilities and a party to the Tariff, has recovered costs for substations and transmission lines associated with other generation facilities through transmission revenue. The spreadsheet contains no revenue figures and does not indicate whether any of the "PECO Comparable Facilities" are also interconnection facilities governed by Section 37.2 of the Tariff. In fact, Petitioner Rock Springs admitted these facilities were not built to connect a generating facility to the PJM Transmission System. Rock Springs stated to the Commission that "[s]ince PJM was restructured as an independent system operator ("ISO") in 1997, no PJM East Transmission Owner has constructed generation and sought to include the transmission facilities associated with such new generation in its rate base." Request for Rehearing of CED Rock Springs, LLC, at 27, Docket No. ER06-491-001 (Apr. 14, 2006). FERC examined this evidence of undue discrimination presented by Petitioners and quite reasonably did not regard it as persuasive. *Order Rejecting Rate Filings*, 114 FERC at 61,964; *Order Denying Rehearing*, 116 FERC at 61,706.

Petitioners also cited *PJM Interconnection, LLC*, 94 FERC ¶ 61,295 (Mar. 15, 2001), *rehearing denied*, 95 FERC ¶ 61,217 (May 16, 2001), to support its claim of undue discrimination. In *PJM Interconnection*, a TO recovered its investment in 42 miles of transmission line through a rate filing for transmission revenue. 94 FERC at 62,074, 62,078. FERC adequately distinguished *PJM Interconnection*, finding no evidence that the

transmission line in that case was constructed to connect a generator to the grid, making Section 37.2 of the Tariff inapplicable to that TO. *Order Denying Rehearing*, 116 FERC at 61,705. Because Section 37.2 was not at issue in *PJM Interconnection*, it did not provide evidence of any discriminatory treatment toward Petitioners. *Id.*

There is insufficient evidence in the record to show that FERC discriminated against Petitioners. Contrary to Petitioners' contention, FERC's statement in its brief that Petitioners failed to sustain their burden of proof on the issue of undue discrimination, is not a post-hoc rationalization. *See id.* at 61,706 (referring to Petitioners' contention that other TOs are recovering costs for similar facilities and stating that Petitioners "offer no citations to show that there are any similarly situated projects that have been treated differently").

## III. Conclusion

Because we conclude that FERC adequately explained its decision to deny Petitioners' rate filings and Petitioners presented no evidence that FERC acted with any undue discrimination, we deny their petition for review.